UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICAH NELSON,

                Petitioner,

-vs-                                       Case No.  8:10-cv-2280-T-33EAJ

SECRETARY, DEPT. OF CORRECTIONS,

                Respondent.

_____

## ORDER

     This cause is before the Court on Petitioner Micah Nelson's 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus (hereinafter "Petition" or "petition"). (Doc. 1).  Nelson is a Florida inmate who has been sentenced to death. The Respondent filed a Response in opposition to the Petition (Doc. 17) and Nelson filed a reply to the response. (Doc. 20). Nelson is represented by Capital Collateral Regional Counsel-Middle Region (CCRC-M) Attorneys Ali A. Shakoor and James Vincent Viggiano, Jr.

     The issues have been fully briefed and the case is ready for decision.  No evidentiary hearing is necessary because the record is fully developed and the claims of the Petition raise issues of law, not issues of fact.  *See Breedlove v. Moore*, 279 F.3d 952, 959 (11th Cir. 2002).   Upon a review of the entire record and the Parties' written submissions, the Court finds that all of Nelson's claims lack merit.  **The Petition will be denied in its entirety**.

## FACTS AND PROCEDURAL HISTORY

The facts of the case and procedural history through trial are stated at length in the

Florida Supreme Court's opinion denying Nelson's direct appeal. *See Nelson v. State*, 850

So. 2d 514 (Fla. 2003) (Ex. A35):

> The evidence presented at trial indicated that during the early morning hours of November 17, 1997, Micah Louis Nelson (Nelson) entered Virginia Brace's (Brace) home by removing the screen and climbing through the bathroom window. Seventy-eight-year-old Brace had been in bed and her glasses and hearing aid were on her bedroom dresser. Nelson sexually assaulted Brace, took her car keys from her purse, and then placed her in the trunk of her own car. He drove around with Brace in the trunk for a period of hours and eventually drove to an orange grove, where he apparently intended to leave her. However, the car became stuck in soft sand and had to be pulled out with the assistance of machinery at about 9:30 a.m. on November 17, 1997.

> Steven Weir, the heavy equipment operator who pulled the car out of the sand, felt a thud when he put his hand on the car's trunk. Nelson advised him that there was a dog in the trunk and then proceeded to turn up the car radio. The heavy equipment operator observed Nelson to be nervous and pacing, and Nelson would not look him in the eye when they spoke. Nelson sped off as soon as the car was lifted out of the sand and drove to another orange grove where he let Brace out of the trunk and walked her or dragged her 175 feet into the grove. FN1 With Brace on the ground, Nelson attempted to strangle her with his bare hands, emptied the contents of a fire extinguisher into her mouth, and forced a tire iron into her mouth and through the back of her head.

> > FN1. The medical examiner testified that the soles of Brace's feet were dirty, indicating that "she probably left standing on her feet," but that there was also evidence that she had been dragged on her back.

> At 3:30 p.m. on November 17, 1997, Joann Lambert noticed an unfamiliar car parked on the road behind her house. The car was still parked in the same location when it began to get dark that evening so she called the Highlands County Sheriff's Department. When Deputy Vance Pope arrived to investigate the car, he found Nelson asleep in the back seat. Deputy Pope also noticed an insurance card on the floorboard with the name Virginia Brace. Nelson told Pope that he borrowed the car from a family friend. Pope could not verify the vehicle's registration because the DMV computer was not

2

working at that time. Pope would not allow Nelson to drive because he did not have a driver's license, so he gave Nelson a ride to Nelson's sister's house. Later that evening, Pope heard the name Virginia Brace over the police radio, which prompted him to contact Sergeant Hofstra regarding his earlier contact with Nelson. Police recovered the car where Deputy Pope had last seen it, and it was identified as belonging to Brace.

At 11 p.m. on November 17, 1997, Deputy Pope returned to the house where he previously dropped off Nelson. Nelson agreed to be questioned by the Avon Park Police. After a series of interrogations on November 18, 1997, and November 19, 1997, Nelson showed the police where Brace's body was located and he confessed to killing her.

Nelson told police that some time after midnight, he broke into Brace's home through her bathroom window. He stated that he entered her bedroom and she woke up and started screaming. He said that they had a struggle on her bed, after which he took her car keys and placed her in the trunk of her car. Nelson stated that he drove around in the car for hours and that at one point he stopped to get gas. He then drove to  an orange grove where he was going to kill Brace, but the car became stuck in the sand and he required help to extricate the car from the sand. He then took Brace to another orange grove where he and Brace walked into the grove. He stated that he started to choke Brace on the ground, but she did not pass out, so he sprayed a fire extinguisher into her mouth, which made her cough. He stated that he then took the tire iron and stuck it into her mouth until it came through the back of her neck and into the ground. He stated that Brace gasped for air when he pushed the tire iron into her mouth. Nelson denied having any sexual contact with Brace.

At trial, Dr. Melamud, the medical examiner, testified that the condition of Brace's body corresponded with her being dead for two days before she was found. He testified that Brace's injuries were consistent with asphyxiation, an object being forced into her mouth through the back of her neck, such as a tire iron, and a fire extinguisher being discharged into her mouth. He stated that she also suffered a crushed vertebra as a result of the compression of her neck and spinal cord, and three broken ribs. He testified that her death could have resulted from any one of those injuries, or a combination of them. Although he could not assign an order in which the injuries occurred, he stated that the medical evidence indicated that she was alive both when the object was forced into her mouth and through the back of her neck, and when the fire extinguisher's contents were expelled into her mouth.FN2 He could not say with certainty if she was conscious when those injuries were inflicted, but he opined that if Brace had been conscious during the infliction of any of these injuries, she would have experienced severe pain.

3

FN2. An emptied fire extinguisher was recovered on the rear floor of the driver's seat of Brace's car. A yellow powdery substance from the extinguisher's contents was located around the hose. The yellow powder was also found on the rear floorboard behind the driver's seat, in the trunk, and on Brace's face and in her bronchial tubes.

Karen Cooper, a laboratory analyst with the Florida Department of Law Enforcement (FDLE), testified that prints made from boots recovered from Nelson's bedroom at his sister's house were consistent with boot prints found at the orange grove on the ground near Brace's body. Stephen Stark, a latent fingerprint examiner with FDLE, testified that Nelson's latent prints were found inside Brace's bathroom on the towel rack, on tiles under the bathroom window, on the bathroom tub, and on the bathroom door jamb. Stark, who also processed the crime scene at the orange grove, testified that there was a hole in the ground beneath the back of the victim's head and that a yellow powdery substance was found on the ground where the body was located. He also testified that three prints found in the interior of the trunk were consistent with Brace's fingerprints. Stark stated that when he processed the car, the trunk liner was moist and smelled of urine. Jennifer Garrison, an FDLE crime lab analyst in the serology DNA section, testified that testing revealed the semen found on Brace's bedspread was consistent with Nelson's DNA profile. Darrin Esposito, an FDLE crime lab analyst in the serology DNA section, testified that he tested the vaginal swab taken in this case, and it was consistent with a mixture of DNA from both Brace and Nelson. Jeannie Eberhardt, a serologist with FDLE, testified that the swabbing of the tire iron found in the trunk of Brace's car came back positive for indications of blood.

The jury recommended a death sentence by a vote of nine to three and the trial court sentenced Nelson to death. The trial court found six statutory aggravators: (1) the defendant was previously convicted of a felony, was under a sentence of imprisonment, and was on felony probation, or controlled release, at the time of the murder; (2) the crime for which the defendant was to be sentenced was committed while the defendant was engaged in the commission of, or flight after, committing a sexual battery, burglary, or kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the murder was especially heinous, atrocious or cruel (HAC); (5) the murder was committed in a cold and calculated and premeditated manner, and without any pretense of moral or legal justification (CCP); and (6) the victim was particularly vulnerable due to advanced age or disability. The trial court found that all six aggravators were proven beyond a reasonable doubt and assigned five of them great weight. The trial court assigned little weight to the sixth aggravator of the victim being "particularly vulnerable due to age or disability."

The trial court addressed and rejected three statutory mitigating factors. FN3 Twenty-one nonstatutory mitigating circumstances were addressed by the trial court: (1) at the time of the offense the defendant was impulsive and his ability to exercise good judgment was impaired (not proven); (2) defendant was remorseful for his conduct (not proven); (3) defendant did not plan to commit the offense in advance (not proven); (4) defendant demonstrated appropriate courtroom conduct and behavior (very little weight); (5) defendant is capable of forming loving relationships with family members and friends (very little weight); (6) any mental illness of the defendant may have been controlled by medication (little weight); (7) it is unlikely the defendant will be a danger to others while serving a life sentence in prison (very little weight); (8) defendant did not resist arrest, cooperated with the police, and showed the authorities where the body was located (moderate weight); (9) defendant never knew his father and lost his mother at a young age (moderate weight); (10) defendant had a troubled and neglected childhood (not proven); (11) defendant was the victim of inappropriate sexual conduct and abuse as a child (little weight); (12) defendant has organic brain damage (not proven); (13) defendant suffered from depression as a result of his conduct and attempted suicide in the jail (little weight); (14) defendant had diminished educational experience (little weight); (15) defendant was sexually assaulted while in prison (some weight); (16) defendant has limited intelligence (some weight); (17) defendant has no prior violent felony convictions (little weight); (18) the circumstances which resulted in the homicide are unlikely to recur since the defendant will be spending the rest of his life in prison (some weight); (19) defendant has accepted responsibility for his action (not proven); (20) defendant has never received treatment for his mental or emotional problems (little weight); and (21) defendant was willing to plead guilty to all charges for consecutive life sentences without parole (very little weight).

> FN3. The three statutory mitigating factors addressed by the trial court were: (1) age of the defendant at the time of the offense (twenty-one years old) (not proven); (2) the defendant was under extreme mental or emotional disturbance at the time of the offense (not proven); and (3) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (not proven).

*Nelson*, 850 So. 2d at 518-21. (Ex. A35).

Nelson appealed, and on October 3, 2002, the Florida Supreme Court affirmed

Nelson's conviction and sentence. (Ex. A31). Nelson filed a motion for rehearing and then

a corrected motion for rehearing. (Exs. A32; A34). Following a response by the State (Ex.

A33), the Florida Supreme Court denied rehearing and issued a revised opinion. *See Nelson v. State*, 850 So. 2d 514 (Fla. 2003) (Ex. A35). The mandate issued August 7, 2003. (Ex. A36).

Nelson filed a petition for writ of certiorari in the United States Supreme Court on October 8, 2003. (Ex. B1). The Court denied the petition on December 15, 2003. *Nelson v. Florida*, 540 U.S. 1091 (2003). (Ex. B3).

On September 17, 2004, Nelson filed a rule 3.851 motion for postconviction relief with the trial court and simultaneously filed a rule 3.851(g) motion for competency determination. (Ex. C6:864-962; 963-966).

### Rule 3.851(g) Motion for Competency Determination

In response to Nelson's motion to determine competency, the state trial court appointed two experts,  Drs. Richard Carpenter and Ralph Dolente, to examine Nelson to determine his competency to proceed in his state postconviction proceedings. (Ex. C6:1001-04). On January 5, 2006, the court appointed a third expert, Dr. Joseph Sesta, to examine Nelson for competency. (Ex. C6:1007-09). The court conducted a competency hearing on September 27, 2006, at which the three expert witnesses testified regarding their competency evaluations. (Ex. C10-11:1476-1762).

At the hearing, collateral counsel[1] presented the testimony of Dr. Richard Carpenter. Dr. Carpenter had examined Nelson for half an hour and determined that Nelson was incompetent to proceed, primarily due to Nelson's eye movements and his inability to answer rudimentary questions. (Ex. C10:1502-05, 1514-16).  Dr. Carpenter opined that

---

[1] Nelson was represented by CCRC-M attorneys Viggiano and Richard E. Kiley.

6

Nelson was having auditory hallucinations because his eyes moved from side-to-side as if he were responding to internal stimuli. (Ex. C10:1505). Dr. Carpenter ultimately diagnosed Nelson as having a major mental illness, psychotic disorder, not otherwise specified. (Ex. C10:1516). However, Dr. Carpenter did not perform any testing to determine whether Nelson was malingering. (Ex. C10:1522-40).

The State presented the testimony of Dr. Dolente who had examined Nelson and found him competent to proceed. Dr. Dolente diagnosed Nelson as having an adjustment disorder, antisocial personality, and malingering. (Ex. C10:1571). Dr. Dolente did not observe Nelson moving his eyes during his evaluation and he disagreed with Dr. Carpenter's opinion that Nelson was suffering from auditory hallucinations. (Ex. C10:1571-77). Dr. Dolente explained that Nelson did not begin complaining of hallucinations until after he was charged with first degree murder but that Nelson had told other mental health experts that he began having these hallucinations as a teenager. In Dr. Dolente's opinion, it would be "unheard of" and "virtually impossible" for Nelson to have an onset of adolescent schizophrenia without being flagrantly mentally ill to the point of multiple hospitalizations and mental health admissions; something that was not present in Nelson's background. (Ex. C10:1575-77). In Dr. Dolente's opinion, Nelson presented a "Hollywood-type pattern of classic malingering" by feebly attempting to feign amnesia. (Ex. C10:1582-90).

Additionally, the court heard testimony from Dr. Sesta. Similar to Dr. Dolente, Dr. Sesta opined that Nelson was malingering, had antisocial personality disorder, and suffered from a depressive disorder. (Ex. C11:1664). Dr. Sesta testified that he disagreed with Dr. Carpenter's findings, but did not disagree with Dr. Dolente in any respect. (Ex.

C11:1666-67).   Dr. Sesta testified that Nelson's answers to basic questions were not credible -- "those responses would only be present if someone were in the advanced stages of Alzheimer's disease or had suffered a catastrophic brain injury." (Ex. C11:1669-70). Dr. Sesta concluded that Nelson had the capability to fully cooperate, but consciously chose not to assist in the mental status exam. (Ex. C11:1672).  After hearing the testimony from the three experts, the trial court entered an order finding Nelson competent to proceed. (Ex. C7:1032-38).

## Rule 3.851 Motion for Postconviction Relief

On June 21, 2007, the trial court conducted a case management conference on Nelson's rule 3.851 postconviction motion and determined that it would be appropriate to conduct an evidentiary hearing on Claims I, II, III, IV, V, and VII. (Ex. C7:1050-51).

<u>Evidentiary Hearing</u>

At the evidentiary hearing conducted October 16-17, 2007, Nelson was represented by CCRC-M Attorney Shakoor.  Nelson presented the testimony of trial attorneys Robert Trogolo and Julia Williamson, and mental health experts Drs. Mark Ashby, Henry Dee and Michael Maher. In addition, the parties stipulated that the evidence and testimony from the competency hearing conducted on September 27, 2006, would be incorporated and filed as exhibits for the trial court's consideration in lieu of again hearing the testimony at the October 2007 hearing.

Attorney Trogolo testified that he began working at the Public Defender's Office in 1984, and was lead counsel for Nelson at his trial which began on November 30, 1999.[2]

---

[2] Brace was murdered on November 16, 1997, and Nelson was arrested the following morning.

(Ex. C7:1065-66). Although Trogolo shared responsibilities with co-counsel Williamson, Trogolo was primarily responsible for the penalty phase. (Ex. C7:1066).

When Trogolo inherited the case from another assistant public defender, Dr. Dee had already been appointed and Trogolo decided to keep Dr. Dee as his mental health expert. Trogolo was aware of Dr. Dee's diagnosis[3] and was further aware that Nelson had attempted suicide while incarcerated. (Ex. C7:1067-68). Although Trogolo was aware that Dr. Dee would testify at the penalty phase that the two statutory mental mitigating factors were present, Trogolo testified that the defense team made a tactical decision not to request a specific jury instruction on these mitigators at the charge conference prior to the penalty phase. (Ex. C7:1076-82). Trial counsel recalled telling the trial court that it was a tactical decision not to request specific jury instructions on the statutory mental mitigating factors.

> MR. TROGOLO: The next page is the mitigating circumstance that we're requesting that the Court instruct upon, in other words, the two generals in eight.
>
> THE COURT: Okay. And obviously you don't object to that, Mr. Wallace.[4]
>
> MR. WALLACE: Your Honor, just so we're clear, the defense, the defendant is not asking for any of the other statutory mitigating

---

[3] Dr. Dee advised Trogolo that Nelson was marginally competent, but Dr. Dee thought Nelson needed to go to the State Hospital for treatment because he was not responding to the medication administered at the jail. (Ex. C7:1068). However, in order for that to occur, Nelson would need to be found incompetent by the trial court. Because Dr. Dee had opined that Nelson was competent, and Trogolo and the defense team never saw anything to call into question that finding, Trogolo did not file a motion for competency determination. (Ex. C7:1105-08).

[4] Attorney Paul R. Wallace was an assistant state attorney at the time of Nelson's charge conference.

circumstances?

MR. TROGOLO: That's correct, your Honor. That's a tactical decision that we made.

(Ex. A24:2917).  As Trogolo explained in great detail at both the trial (Ex. A24:2917-24) and the evidentiary hearing (Ex. C7:1077-82), the defense made a tactical decision not to request special instructions on the statutory mental mitigators, but rather, argued to the jury that Dr. Dee's mental health diagnosis constituted mitigation evidence under the statutory "catch-all" instruction.  At trial, Nelson even acknowledged under oath that he understood that he was entitled to the instructions, but that his attorneys had explained to him their tactical reasons for proceeding with the catch-all instruction and that he understood and was satisfied with this decision.[5] (Ex. A24:2921-22).

Trogolo explained at the evidentiary hearing that, as he stated on the record at the time of trial, he made the tactical decision to proceed with the catch-all instruction because he was afraid the prosecution would be able to diminish the impact of Dr. Dee's testimony by arguing that the mental mitigation did not rise to the modifying level of "extreme" or "substantial."  Furthermore, he did not want the jury to hear that some mitigation was "statutory" and some was "nonstatutory" because the jurors might not place the appropriate weight on the nonstatutory mitigation. (Ex. C7:1079-82).  Counsel acknowledged that his decision did not impair in any way his ability to present to the jury mental health mitigation from Dr. Dee.  Furthermore, Trogolo testified that the tactical decision to forego requesting specific jury instructions on the two statutory mental mitigators did not preclude him from

_____

[5]  Trogolo testified at the evidentiary hearing that he was not surprised that Nelson understood this decision because the attorneys had discussed this decision with him prior to the charge conference. (Ex. C7:1083-85).

arguing their existence to the jury in closing argument. (Ex. C7:1081-82).

In addition to discussing his strategy regarding jury instructions, Trogolo also testified regarding his observations of Nelson during the time Trogolo represented him.  As previously noted, Trogolo was aware of Nelson's suicide attempt while Nelson was incarcerated and was also aware that the jail psychiatrist, Dr. Ashby, had prescribed psychotropic medication to Nelson prior to, and during trial. In fact, Trogolo specifically requested that the trial judge instruct the jury that Nelson was under the influence of psychotropic medication during the trial. (Ex. C7:1070). Trogolo explained that he requested this instruction because he thought it would be good for the jury to hear this information, and further, if the State opposed the instruction and the court denied his request, the denial would create a potential appellate issue.[6]  (Ex. C7:1070, 1112-13).

During the time he represented Nelson, Trogolo met with Nelson weekly or bi-weekly. (Ex. C7:1103). Additionally, co-counsel Williamson and mitigation specialist Tony Maloney[7] also met with Nelson. (Ex. C7:1103-04). Based on his lengthy experience in dealing with criminal defendants, counsel was aware of the requirements for seeking a competency determination. (Ex. C7:1085-94). Based on his involvement with Nelson, coupled with Dr. Dee's diagnosis, Trogolo did not see a need to seek a judicial determination of competency to proceed to trial. Trogolo made clear on the record at the

---

[6] Prior to trial, Trogolo had obtained Nelson's jail medical records. (Ex. C7:1098-1101). After requesting the special instruction, the State objected, at which time the court heard testimony from Dr. Ashby. (Ex. A15:1362-70, 1393-1407, 1434-50).  After hearing from Dr. Ashby, the court decided to give the defense's requested instruction.

[7] Mitigation specialist Tony Maloney had a background in mental health. She had previously worked at a mental health facility. Trogolo believed she had a Masters degree in psychology. (Ex. C7:1094).

time of trial, and reiterated at the postconviction evidentiary hearing, there was no valid claim that Nelson was incompetent to proceed at the time of his trial. (Exs. A15:1365, 1400-04, 1446; C7:1098-1108).

Trogolo testified that it was not unusual for him to proceed to a penalty phase proceeding with only one mental health expert. In addition to having obtained the services of Dr. Dee, Trogolo had also obtained the jail medical records and was aware of Dr. Ashby's treating Nelson. Also, Trogolo had obtained an earlier mental health report from Dr. William Kremper.[8]  (Ex. C15:619-23).  Trogolo testified at the evidentiary hearing that he made a tactical decision, after consulting with Dr. Kremper, not to present Dr. Kremper's testimony at the penalty phase because Trogolo was concerned that any advantage gained by calling him would have been outweighed by the negative "baggage" that Dr. Kremper could present. (Ex. C7:1100-03).  Likewise, Trogolo did not call any mental health expert during the guilt phase to dispute the *mens rea* requirement of first degree murder because mental health evidence was not allowed unless insanity was the defense. The insanity defense was not available in Nelson's case. (Ex. C7:1117-21).

Co-counsel Williamson testified at the evidentiary hearing that she worked on both the guilt and penalty phase of Nelson's trial, but because Nelson's was the first time she was involved in a penalty phase, Trogolo handled more of the penalty phase presentation before the jury than she did. (Ex. C8:1187-90). Williamson testified that Nelson was not forthcoming with facts about the case.  She testified that the guilt phase theory of defense

---

[8]  Dr. Kremper had examined Nelson in 1992 after Nelson had been charged with multiple counts of sexual abuse against his five-year-old cousin.

was to argue for second degree murder.[9] (Ex. C8:1195-98). She claimed that, in hindsight, she should have called Dr. Ashby during the guilt phase to testify that Nelson had schizoaffective disorder and auditory hallucinations.[10] (C8:1200-01). Williamson further testified that, she should have requested a competency evaluation of Nelson because he was not forthcoming to her about the facts of the case. (Ex. C8:1198). As noted, however, Williamson acknowledged that Nelson gave a detailed factual confession to other members of the defense team.

In addition to Nelson's trial attorneys, three mental health experts testified at the postconviction evidentiary hearing. Jail psychiatrist Dr. Ashby testified regarding the medication he prescribed for Nelson while Nelson was awaiting trial in 1997-99. Dr. Ashby testified that he diagnosed Nelson at that time as having schizoaffective disorder and prescribed Mellaril, an antipsychotic medication designed to stop hallucinations, and Imipramine, an antidepressant.[11] (Ex. C7:1138-41).

Dr. Dee, a neuropsychologist, testified that he first met Nelson on June 15, 1998,

---

[9] As the Florida Supreme Court noted on direct appeal, Nelson confessed to law enforcement officers to breaking into the victim's home, kidnapping her, and subsequently violently killing her. *Nelson*, 850 So. 2d at 519. Nelson denied sexually abusing the victim. *Id.*

Although Williamson did not recall specific conversations with Nelson regarding the facts of the case, she acknowledged on cross examination that Nelson had told other members of the defense team a version of the facts similar to the one he gave law enforcement. (Ex. C8:1232-39).

[10] On cross examination, Williamson acknowledged that this type of diminished capacity evidence would not have been admissible during the guilt phase of Nelson's trial. (Ex. C8:1209-12).

[11] Dr. Ashby gave the same information at Nelson's trial when he testified in conjunction with defense counsel's request for a jury instruction on psychotropic medication. (Ex. A15:1438-47).

at the request of the Public Defender's Office. At their initial meeting, Nelson was primarily mute and unresponsive. (Ex. C7:1159-61). Later that same day, after being sent back to the jail, Nelson attempted suicide. Dr. Dee initially believed that Nelson was suffering from severe depression. (Ex. C7:1161).

Dr. Dee subsequently met with Nelson on July 7, 1998, and conducted a "more adequate" interview and administered both psychological and neuropsychological tests. Dr. Dee further interviewed Nelson on July 23-24, 1998; July 28, 1998; September 14, 1998; October 13, 1998, February 1, 1999; and on November 24, 1999, one week before Nelson's trial began. (Ex. C7:1161-62). Dr. Dee diagnosed Nelson with schizoaffective disorder and depression. (Ex. C7:1163-64). When Dr. Dee met with Nelson after his suicide attempt, Dr. Dee found that Nelson's condition had improved, presumably from the medication he had been receiving at the jail. (Ex. C7:1164).

Dr. Dee testified that he suggested to Nelson's counsel "on more than one occasion" that Nelson be treated at the state mental hospital. Dr. Dee was concerned about Nelson's competency, but it was difficult because Nelson's condition "waxed and waned" at various times; sometimes Nelson was unresponsive and mute, and at other times, he was open and "easy to talk to." (Ex. C7:1166-67). Dr. Dee stated that at his last visit with Nelson only a week before the trial, Nelson was very clear and forthcoming with information. (Ex. C8:1176). Ultimately, Dr. Dee informed Trogolo that Nelson was "marginally competent" to proceed. (Ex. C7:1172). Dr. Dee further informed Trogolo that he had nothing to offer in the guilt phase because Nelson's mental status did not rise to the level of insanity. (Ex. C8:1176-82).

Dr. Maher testified that he was retained by CCRC-M to evaluate Nelson for

14

mitigation issues. (Ex. C8:1266-69). Dr. Maher reviewed background material and interviewed Nelson on June 2, 2004.  Dr. Maher opined that Nelson had schizoaffective disorder and that as of June 2, 2004, was not competent to proceed.[12] (Ex. C8:1279-87). Dr. Maher did not form an opinion as to Nelson's competency at the time of his trial, and he did not think it was possible at the time of the evidentiary hearing to reach a conclusion on that issue. (Ex. C8:1294). Dr. Maher further testified that both statutory mitigating factors applied in this case.[13] (Ex. C8:1287-88).

After hearing the testimony from the competency hearing and the evidentiary hearing, the trial court entered a detailed 73-page order denying Nelson's rule 3.851 postconviction motion. (Ex.C9:1389-1462). Nelson appealed the denial of postconviction

---

[12] Dr. Maher, however, did not review any of the court-appointed experts' reports from the competency evaluations conducted in 2005 and 2006, nor did he perform any type of formalized testing to determine competency. (Ex. C8:1292-93).

[13]  The statutory mitigating factors include:

(a) The defendant has no significant history of prior criminal activity.
(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(c) The victim was a participant in the defendant's conduct or consented to the act.
(d) The defendant was an accomplice in the capital felony committed by another person and his or her participation was relatively minor.
(e) The defendant acted under extreme duress or under the substantial domination of another person.
(f) The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.
(g) The age of the defendant at the time of the crime.
(h) The existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty.

**Dr. Maher testified that (b) and (f) would apply in Nelson's case**. (Ex. C8:1287-88).

relief to the Florida Supreme Court (Ex. C16), and simultaneously filed a state petition for writ of habeas corpus.

The Florida Supreme Court denied all relief on April 29, 2010. *Nelson v. State*, 43 So. 3d 20 (Fla. 2010); (Ex. C22).   The court denied Nelson's motion for rehearing on August 23, 2010, and the mandate issued September 8, 2010. (Exs. C23, C24, C25).

Following the denial of all relief in the state courts, Nelson timely filed the present federal 28 U.S.C. § 2254 petition for writ of habeas corpus.

STANDARD OF REVIEW

This petition is governed by the provisions of section 2254 of the United States Code, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782 (2001); *Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001); *Bottoson v. Moore*, 234 F.3d 526, 530 (11th Cir. 2000). The AEDPA affected this Court's review of both factual findings and legal rulings entered by the state courts in the rejection of Nelson's claims. Pursuant to 28 U.S.C. § 2254(e)(1), this Court's review of the state courts' factual findings must be highly deferential; such findings are presumed correct, unless rebutted by a petitioner with clear and convincing evidence. *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001); *Bottoson*, 234 F.3d at 531. The AEDPA "'modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.'" *Parker v. Secretary, Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003) (quoting *Bell v. Cone*, 535 U.S. 685, 693 (2002)).

Similarly, the legal rulings of claims adjudicated in state courts only provide a basis for federal relief where the state court adjudication was either "contrary to" clearly

16

established federal law as determined by the United States Supreme Court, or involved an "unreasonable application" of such law. *See* 28 U.S.C. § 2254(d)(1). In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed these standards at length. The Court explained that a state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. The question is whether the state court correctly identified the proper rule of law to be applied. *Putman,* 268 F.3d at 1241; *Bottoson*, 234 F.3d at 531. A state court decision is not "contrary to" established federal law even if a federal court might have reached a different result relying on the same law. *Williams*, 529 U.S. at 406.

A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law, but unreasonably applies that rule to the facts of the petitioner's case. *Putman,* 268 F.3d at 1241. An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. *Id.* It should be noted that an "unreasonable application" does not mean that the federal law was incorrectly or erroneously applied; the application must be "objectively" unreasonable. *Williams*, 529 U.S. at 412; *Breedlove v. Moore,* 279 F.3d 952 (11th Cir. 2002). It is also important to recognize that the measuring stick of "clearly established federal law" refers only to the holdings of the United States Supreme Court, as opposed to dicta, at the time of the relevant state law decisions. *Putman*, 268 F.3d at 1241.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court set forth the

standard for relief where error is determined to exist on habeas review. This test is "less onerous" than the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637. Although no constitutional error has occurred in this case, any possible error would clearly be harmless beyond any reasonable doubt based on the facts and the record herein.

### THE AEDPA STANDARD FOR FEDERAL EVIDENTIARY HEARINGS

No evidentiary hearing is warranted in this case on any of Nelson's claims. The Eleventh Circuit Court of Appeals has acknowledged that the AEDPA brought a significant change to the standards governing the granting of evidentiary hearings in federal habeas cases. In *Breedlove v. Moore*, 279 F.3d 952, 959 (11th Cir. 2002), the court stated:

> One purpose of the AEDPA has been to simplify and speed the federal habeas process; consistent with this goal, the AEDPA added the following provision to § 2254:
>
> > If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
> >
> > (A) the claim relies on
> >
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

18

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. 2254(e)(2).

This provision places a fairly stringent limitation on the power of the federal courts to order evidentiary hearings in habeas cases. Indeed, if a petitioner fails to develop an adequate factual record in the state courts, an evidentiary hearing could only be ordered if one of the two narrow exceptions to the general rule prohibiting such hearings applied.

The burden is on the petitioner in a federal habeas corpus proceeding to show the necessity for an evidentiary hearing. *See e.g. Williams v. Griswald*, 743 F.2d 1533 (11th Cir. 1984); *Birt v. Montgomery*, 725 F.2d 587 (11th Cir. 1984). No evidentiary hearing is required by a district court if a state court has made findings of fact, as the federal courts must presume those facts to be correct. *Townsend v. Sain*, 372 U.S. 293 (1963); 28 U.S.C. 2254(d). Nelson had a full and fair evidentiary hearing in state court to develop his postconviction claims. None of Nelson's ineffective assistance of counsel claims requires factual development during an evidentiary hearing in this Court.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-part test for reviewing claims of ineffective assistance of counsel, which requires a defendant to show that (1) counsel's performance was deficient and fell below the standard for reasonably competent counsel, and (2) the deficiency affected the outcome of the proceedings. The first prong of this test requires a defendant to establish that counsel's acts or omissions fell outside the wide range of professionally competent

assistance, in that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 690. The second prong requires a showing that the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and thus there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 687, 695. The Court has recently noted that "[s]urmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011)(quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)).

Proper analysis requires a court to eliminate the distorting effects of hindsight and evaluate the performance from counsel's perspective at the time, and to indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland* at 689. Judicial scrutiny of attorney performance must be highly deferential. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. A defendant bears the heavy burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy, and that prejudice resulted. *Id.* at 689.

In order to overcome *Strickland*'s presumption of reasonableness, Petitioner must show that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). In *Chandler*, the Eleventh Circuit noted that given the applicable principles and presumptions, "'the

cases in which habeas petitioners can properly prevail . . . are few and far between. '" *Id.* at 1313. As recently recognized in *Hammond v. Hall*, 586 F.3d 1289, 1324-25 (11th Cir. 2009):

> Under AEDPA, however, [a Petitioner] must do more than satisfy the *Strickland* standard. See 28 U.S.C. § 2254(d). Because the [Florida] courts have already rejected these ineffective assistance claims, [a Petitioner] must show that their decision to deny relief on these claims was an objectively unreasonable application of the *Strickland* standard. *See Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold."); *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002); *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) ("[T]he AEDPA adds another layer of deference.... [The petitioner] must also show that in rejecting his ineffective assistance of counsel claim the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner.") (internal quotation marks and citation omitted).

*Cf. Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (noting *Strickland* standard of review is doubly deferential under 28 U.S.C. § 2254(d)(1)).

## DISCUSSION

### Ground One[14]

The trial court erred by failing to grant Petitioner's motion to suppress his statements and admissions, and the resulting evidence, because his statements were involuntary and thus were not trustworthy or reliable. This error violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution.

Nelson alleges that the state courts erred in admitting his confession to law enforcement officers because the detectives "used unwarranted coercive tactics" and his

---

[14] All of the grounds are stated as Nelson presented them in his federal habeas petition.

confession was not given voluntarily. (Doc. 1 at 4-7; Doc. 2 at 7). Specifically, Nelson states

that the detectives improperly used the "Christian burial" technique[15] and interrogated him

when he was tired. The trial court conducted a hearing on Nelson's motion to suppress and,

after hearing the testimony, denied the motion. (Exs. A3-4:454-563; A4:611-65; A5:731-35).

On direct appeal to the Florida Supreme Court, Nelson argued that his statement

was made in response to police coercion and was improperly admitted at trial. (Ex. A28 at

34-49). The Florida Supreme Court affirmed the state trial court's ruling denying the motion

to suppress:

> Nelson claims that the trial court erred in denying his motion to suppress statements and admissions. He maintains that he made incriminating statements as a result of police coercion because the police prematurely wrote "DNA evidence" on the board during interrogation, they employed the "Christian burial" technique, and they continued to question him when he was fatigued. After hearing evidence at the hearing on the motion, the trial court denied the suppression motion.

> This Court has recently explained the standard of review for orders on motions to suppress:

> > [A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.

> *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001). At the trial court level it is proper to apply a "totality of the circumstances" analysis when determining if a confession was obtained voluntarily. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); *Thompson v. State*, 548 So. 2d

---

[15] *See Roman v. State*, 475 So. 2d 1228 (Fla. 1985). In that case, Roman made an incriminating statement to police after they asked him to tell them where the body was located for purposes of a Christian burial, although the police had already located the body.

198, 203-04 (Fla. 1989).

Avon Park Police Sergeant John Wayne Robinson testified that while Nelson was in a separate room taking a polygraph test, he made a "pro and con" list of factors for and against Nelson on a wipe-off board. Sergeant Robinson listed "DNA evidence" under the "con" category. Sergeant Robinson stated that at the time he and others were developing a strategy for interrogating Nelson with the board, he had been advised that evidence had been collected for future testing of DNA. The evidence thought to contain DNA included the victim's underwear, some cigarettes similar to the brand Nelson smoked, and fluids in the trunk. Sergeant Robinson stated that he actually had no information regarding any DNA testing results at that time.

The trial court considered the "DNA evidence" writing claim in light of all the evidence in the record, and concluded it was insufficient to establish coercion:

> In the instant case, the police did not fabricate any documents, and the DNA evidence writing was not emphasized at the interview. The police did tell the defendant they had his fingerprint inside the victim's home, and this was the truth. The court finds that the writing of DNA evidence on the blackboard does not rise to a level that shocks the conscience and jeopardizes the constitutional rights of the defendant.

As noted above, we must accept the trial court's factual findings if there is evidence to support them, while reviewing the court's legal conclusions de novo. Upon review, we find no error in the trial court's evaluation that the simple listing of "DNA evidence" on the board was not such a substantial misrepresentation as to automatically render Nelson's confession involuntary. *See Escobar v. State*, 699 So. 2d 984, 987 (Fla. 1997) (holding that law enforcement tactics that "go too far" can cause confessions to be suppressed, but that "police misrepresentation alone does not necessarily render a confession involuntary"), *abrogated on other grounds by Connor v. State*, 803 So. 2d 598, 607 (Fla. 2001).

It appears that the DNA listing was inherently ambiguous. While the DNA analysis had not yet been done, it was apparent at that point that DNA evidence had been seized and its analysis would probably play a role in assessing the evidence against Nelson, along with the evidence that already suggested his involvement. The listing did not state that the DNA had been tested and compared to a sample of Nelson's DNA. In fact, it is not clear that a sample of Nelson's DNA had ever been secured at that point. Thus, we find that the trial court did not abuse its discretion when it denied the motion on the basis that "DNA evidence" was written on the board in the interrogation

room, before testing had actually been done for the presence of DNA.

Next, Nelson claims that his statements were coerced by improper use of the "Christian burial" technique. While police were questioning Nelson to see if he would aid in locating Brace's body, Sergeant Robinson asked Nelson whom he loved and Nelson answered that he loved his sister, Juldy. Sergeant Robinson then asked Nelson if he would be worried if Juldy was missing, and if he would expect the police to investigate it right and how he would feel if the person who knew what happened would not tell the police the truth. Sergeant Robinson asked Nelson to put himself in the victim's family's shoes and imagine how they felt so that the police could help them and put their minds at ease because they were worried about her. Sergeant Robinson testified that he told Nelson, "[I]f she's dead help us find her so we can give her a proper burial just like you would expect for [Juldy] if she was killed." This statement apparently had some effect on Nelson because he began to cry and soon thereafter agreed to take the police to the victim's body.

In its order denying relief on this claim, the trial court stated, "The court finds that the detectives [sic] reference to finding the victim's body so that it could be buried is insufficient to make an otherwise voluntary statement inadmissible under *Hudson v. State*, 538 So. 2d 829 (Fla. 1989) and *Alston v. State*, 723 So. 2d 148 (Fla. 1998)."

In *Hudson*, after the defendant stated to police that the victim was dead and he had seen the body, a police sergeant asked him if he had ever been to a funeral and told him that most people do not go to funerals without a body. *See* 538 So. 2d at 830. The sergeant told him that the family needed to put this situation to rest by seeing the body. *See id.* Upon review, this Court found that this interaction did not constitute the prohibited "Christian burial" technique that we have previously addressed, stating: "This Court has characterized the Christian burial technique as a 'blatantly coercive and deceptive ploy.' ... [H]owever, we find the sergeant's reference to finding the body so that it could be buried insufficient to make an otherwise voluntary statement inadmissible." *Id.*

In *Alston*, a detective testified at the suppression hearing that he felt the victim's mother needed closure because her son was still missing and he mentioned the fact that Alston had a daughter. See 723 So. 2d at 155. The detective mentioned that if someone took Alston's daughter and he did not see her again, he would not get any closure. *See id.* The detective concluded by stating the victim's mother could get some closure if Alston took the police to the victim's body. *See id.* In rejecting a claim of coercion, this Court cited *Hudson*, stating: "[W]e do not find Detective Baxter's statement that appellant should show them where the body was located because Ms. Coon needed

closure was sufficient to make an otherwise voluntary statement inadmissible." *Id.*

Both *Hudson* and *Alston* rely heavily on this Court's earlier analysis and decision in *Roman v. State*, 475 So. 2d 1228 (Fla. 1985). In that case, Roman made an incriminating statement to police after they asked him to tell them where the body was located for purposes of a Christian burial, although they had already located the body. *See id.* at 1230. This Court stated:

> The use of the "Christian burial technique" by law enforcement personnel is unquestionably a blatantly coercive and deceptive ploy. The record shows, however, that the use of this tactic did not directly result in appellant's statement, although we consider it as a factor among the totality of circumstances surrounding the giving of this statement. The record reflects that appellant was a forty-five year old man of intelligence within the normal range, albeit at the lower end. He did not appear intoxicated or mentally ill at the time. He was read *Miranda* warnings, was capable of understanding them, and indicated that he did in fact understand them. He was offered sustenance and not promised or threatened. He was not handcuffed, and despite vomiting and trembling seemed alert and perceptive. Under these circumstances we find that the deception was insufficient to make an otherwise voluntary statement inadmissible.

*Id.* at 1232-33. We find that the trial court properly evaluated the "Christian burial" evidence and did not err when it denied this suppression claim.

In the instant case, there was no police deception, nor did the police inject Christianity or any other religion into the exchange. As we stated in *Johnson v. State*, 660 So. 2d 637 (Fla. 1995): "Using sincerely held religious beliefs against a detainee is quite a distinct issue from a simple noncoercive plea for a defendant to be candid." *Id.* at 643. It also appears that the statements did not exacerbate an already coercive atmosphere to render Nelson's confession involuntary. Although Sergeant Robinson asked Nelson to put himself in the shoes of the victim's family and mentioned the need for a "proper burial," when those statements are viewed under the circumstances of the interview it appears that the burial speech was not patently coercive. Further, as in *Roman*, Nelson did not appear intoxicated or mentally ill at the time he waived his Fifth Amendment rights after being advised of them pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and he appeared to be capable of understanding his rights. He was given breaks and beverages and was not promised anything or threatened. Nelson was upset and crying during portions of interviews, but

the police gave him breaks when he was visibly very upset. Thus, it appears that the trial court did not err when it denied this suppression claim on the basis of *Hudson* and *Alston*.

Nelson also claims police coercion because the police did not afford him breaks during interrogation when he was tired. The First District in *Gaspard v. State,* 387 So. 2d 1016, 1022 (Fla. 1st DCA 1980), found that the defendant's incriminating statements that were made when he was "tired and exhausted" were properly suppressed because they were the product of four days of repeated and coercive interrogations. However, the trial court in the instant case noted that the record was replete with testimony about the police offering Nelson breaks and beverages during the interrogation sessions and found as follows:

> The defendant was initially interrogated from late November 17 until around 8:30 a.m. November 18. At that time, [the police] suspended the interrogation until that night at 9 p.m. The latter interrogation lasted the majority of the night. The same detectives interviewed the defendant throughout the whole process. Detective Lethridge testified that the defendant was given three breaks during that latter period. The court finds that the defendant endured the same interview conditions as the inquiring detectives and that he was afforded several breaks. During these breaks the defendant was offered coffee or cold drinks and allowed to use the restroom. This interview period was not unreasonable.

A suspect's statement to police during an interrogation that he is tired does not necessarily indicate in itself a desire to reassert waived rights. *See Johnson v. State*, 660 So. 2d 637, 643 (Fla. 1995). Based on the record before us supporting the trial court's factual findings, we find that the trial court did not err when it denied suppression of Nelson's statements on the basis that he was fatigued.

In conclusion, because the trial court's factual findings were supported by the record and its legal conclusions are supported by the law of this state, we affirm the trial court's denial of the motion to suppress.

*Nelson*, 850 So. 2d at 521-24 (footnotes omitted).

The state trial court and the Florida Supreme Court applied the proper legal standards in analyzing Nelson's claim and found that "the police interrogation was lawful and cannot be characterized as so coercive to yield an involuntary confession." (Ex.

A5:732-33). In the instant petition and accompanying memorandum of law, Nelson does not demonstrate how the state courts' resolution of this issue was contrary to, or an unreasonable application of, clearly established law as determined by the United States Supreme Court.

Nelson has the burden of overcoming factual findings made by the state courts with clear and convincing evidence. Nelson does not even attempt to meet this burden.

In *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." The *Connelly* Court noted that since the time of the Court's "seminal confession case," *Brown v. Mississippi*, 297 U.S. 278 (1936), the cases involving coerced confessions all "turned on its own set of factors justifying the conclusion that police conduct was oppressive, [and] all have contained a substantial element of coercive police conduct." *Connelly*, 479 U.S. at 163-64.

In this case, as in *Connelly*, the state court found that the police committed no wrongful acts. Nelson has not, and cannot, show that the state court's factual findings are incorrect. The detectives mentioned a "proper burial" for the victim, but there was no deception and the detectives did not interject Christianity or any other religion into the exchange. *Nelson*, 850 So. 2d at 524. Additionally, the state courts rejected Nelson's claim that he was incapable of understanding his rights because he was "tired," given that the record was replete with instances of the detectives' giving Nelson multiple breaks during the interrogation. *Id.* Nelson has failed to establish that the state courts' decisions were contrary to, or an unreasonable application of, clearly established federal law.

27

Ground one does not warrant habeas corpus relief.

## GROUND TWO

The trial court erred by instructing the jury on and finding that Petitioner killed the victim to avoid a lawful arrest, because the evidence failed to prove this aggravator beyond a reasonable doubt.

Nelson asserts that the trial court erred in instructing the jury on the aggravating circumstance that the murder was committed to avoid a lawful arrest because the instruction was unconstitutional and further claims that the evidence was insufficient to support the finding of this aggravator. (Doc. 1 at 7-9; Doc. 2 at 8-12). These claims were presented to the Florida Supreme Court on appeal as Issue II. (Ex. A28 at 50-59).

<u>The Avoid Lawful Arrest Aggravator</u>

The state courts properly found the existence of this aggravator. The Florida Supreme Court noted:

The trial court found that Nelson's sole or dominant motive for the murder (of a victim who was not a law enforcement officer) was for the purpose of avoiding or preventing a lawful arrest. The trial court found that the aggravator was proven beyond a reasonable doubt and listed four factors that supported it as being Nelson's sole murder motive:

(1) The Defendant in his confession to the police said he killed the victim because he was afraid that Virginia Brace could identify him, "because she saw his face."

(2) Once he removed her from her home and placed her in the trunk of her car, she was no longer a threat to his escape.

(3) The Defendant placed the victim in the trunk of her car and drove her around over six hours. Thus he had ample opportunity to release the victim or simply leave her in the trunk. *See Alston v. State*, 723 So. 2d 148, 160 (Fla. 1998).

(4) The victim was abducted from her home and transported to an isolated area where she was killed.

28

We conclude that Nelson's claim that the trial court erred in finding the avoid arrest aggravator is refuted by the record, including his own admissions.

After Brace's body was found, Nelson agreed to waive his rights and to speak with police. When Detective Sergeant Robinson asked why this happened, Nelson responded that he was mad at the world and mad about his life. When Nelson was describing his encounter with Brace in her bedroom, he related that she was screaming and when Sergeant Robinson asked, "And you were saying you didn't want to leave "because of what reason?" Nelson replied, "(Inaudible) she would call the police." Sergeant Robinson then asked, "So you were worried about her calling the police if you left?" Nelson replied, "Yes." Sergeant Robinson asked Nelson, "Why did you put her in the trunk?" Nelson replied, "So no one would see." Nelson expressly agreed with the police when they asked him if he killed Brace because he felt like she could identify him. In fact, when Nelson was asked how Brace could identify him in the dark, he replied, "From the bathroom light." Later on in the interview, Sergeant Robinson asked Nelson, "So what made you kill Ms. Brace?" Nelson answered, "I got scared." Thus, the record reflects that Nelson's own explanations about why he killed Brace consistently related his concerns about her identifying him. *See Walls v. State*, 641 So. 2d 381, 390 (Fla. 1994) (stating that the defendant's argument that the avoid arrest aggravator was improperly found was without merit "because it is directly refuted by the record and Walls' own words").

Although Nelson's admissions to police alone support his intentional elimination of Brace as a witness, other considerations also support the avoid arrest aggravator in this case. For example, when evaluating the avoid arrest aggravator, this Court has stated that it will look at whether the victims knew and could identify their killer, but that this fact alone is insufficient to prove the aggravator beyond a reasonable doubt. *See Farina v. State*, 801 So. 2d 44, 54 (Fla. 2001). We have held that the following evidence is also pertinent when reviewing this aggravator: "[W]hether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant." *Id.* The evidence in this case indicates that Nelson probably could have accomplished the burglary of Brace's home and sexual battery without killing her since Brace likely posed little physical resistance to Nelson: she was 78 years old; she was awakened from her bed in the middle of the night when she was wearing only a nightgown; and at that time her eyeglasses and hearing aids were on her night stand. Further, Nelson easily obtained access to her car. Therefore, it appears that once Nelson immobilized Brace by putting her in the trunk, he secured an uncontested getaway and there was no reason for him to kill her except to eliminate her as a witness. *See Looney v. State*, 803 So. 2d 656, 677-78 (Fla. 2001) (finding that once the

defendants immobilized the victims, gained access to the victims' property and vehicles, and secured an uncontested getaway, the only remaining reason to kill the victims was to eliminate them as witnesses), *cert. denied*, 536 U.S. 966, 122 S. Ct. 2678, 153 L. Ed. 2d 850 (2002).

Nelson's act of taking Brace to a remote area to kill her also lends support to the finding of the avoid arrest aggravator in this case. The evidence at trial was that Nelson drove to an isolated orange grove to kill Brace, but his plan was stymied when the car became stuck in the sand and he needed the assistance of other people to extricate the car. Nelson then drove to another orange grove where he killed Brace. The record reflects that Nelson's journey to two different orange groves was intended to find an isolated place to kill Brace, the sole witness to his crimes. *See Knight v. State*, 746 So. 2d 423, 435 (Fla. 1998); *Preston v. State,* 607 So. 2d 404, 409 (Fla. 1992); *Cave v. State*, 476 So. 2d 180, 188 (Fla. 1985); *Martin v. State*, 420 So. 2d 583, 585 n. 3 (Fla. 1982).

We find no error in the trial court's finding of the avoid arrest aggravator because the defendant's own statements and actions corroborate evidence that the sole or dominant murder motive in this case was to silence Brace as the sole witness against him.

*Nelson*, 850 So. 2d at 525-26 (footnote omitted).

In *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990), the United States Supreme Court stated that "in determining whether a state court's application of a constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process violation or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979)." The *Jackson* Court stated that the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319 (citation omitted). Applying this standard, and giving deference

30

to the state court's unrebutted findings of fact as required under AEDPA, there is no question that a rational factfinder could have found that "the sole or dominant murder motive in this case was to silence Brace as the sole witness against" Nelson.

<u>Constitutionality of the Jury Instruction</u>

The Florida Supreme Court found the portion of Nelson's claim attacking the constitutionality of the jury instruction procedurally barred. The court noted:

> Nelson makes a two-part claim regarding the avoid arrest aggravator. He alleges that (1) the trial court erred by not informing the jurors that when the victim is not a police officer, the primary or dominant motive must be to eliminate the witness or that the State's proof must be very strong; and (2) the trial court erred by finding the avoid arrest aggravator.
>
> As to the avoid arrest aggravator instruction, we agree with the State that Nelson did not properly preserve this issue for review. Although the record reflects that Nelson filed a motion to declare sections 921.141 and 921.141(5)(e), Florida Statutes (1997), unconstitutional, Nelson did not specifically address the avoid arrest jury instruction in that motion. Further, Nelson did not object to the adequacy of the avoid arrest jury instruction at trial. This Court has held that the contemporaneous objection rule applies to *Espinosa* [FN7] challenges. *See Hodges v. State*, 619 So. 2d 272, 273 (Fla. 1993). Failure to make an objection at trial about a jury instruction will render it procedurally barred. *See id.* Because the record reflects that Nelson did not object to the avoid arrest aggravator jury instruction at trial, we find this issue procedurally barred.
>
> > FN7. *Espinosa v. Florida*, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992) (finding that the HAC jury instruction given in that case was impermissibly vague).

*Nelson*, 850 So. 2d at 525. The Florida Supreme Court relied on an adequate and independent state procedural bar to reject Nelson's claim, thus precluding this Court from reviewing the claim. *Harris v. Reed*, 489 U.S. 255, 262-263 (1989).

Ground two does not warrant habeas corpus relief.

**GROUND THREE**

The trial court erred by finding that the homicides [sic] were committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

Nelson argues that the state trial court erred in finding that the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP). (Doc. 1 at 9-11; Doc. 2 at 12-15). Nelson presented this claim to the Florida Supreme Court solely as a violation of state law and does not involve any alleged violation of a federal constitutional right. The Florida Supreme Court properly rejected this claim on the basis of state law.

<u>Merits of the Claim</u>

There is no question that a rational factfinder could have found that Nelson murdered the victim in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The Florida Supreme Court discussed at length the unrebutted factual circumstances supporting the finding of the CCP aggravator:

> Nelson claims that the trial court's finding of the cold, calculated, and premeditated aggravator (CCP) was contrary to the evidence because, he asserts, the evidence established that he killed Brace in a rage or panic, negating the elements necessary to prove CCP. In the sentencing order, the trial court referred to Nelson's admission to police that he would have killed Brace at the first orange grove except that the car became stuck in sand. The trial court stated that heightened premeditation was further demonstrated by the evidence that Nelson drove to another orange grove and walked or dragged Brace to the place where he killed her and he made two trips back to the car to get weapons.

> We find that regardless of whether Nelson intended to kill Brace at the time he entered her house, his act of driving around with the victim in the trunk for several hours and taking her to two remote locations before killing her indicates that, at the least, he conceived the plan to kill her during that extended period. *See Knight v. State*, 746 So. 2d 423, 436 (Fla. 1998) (finding that "[e]ven if Knight did not make the final decision to execute the

32

two victims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill"); *see also Connor v. State*, 803 So. 2d 598, 611 (Fla. 2001) (affirming CCP where the trial court's finding included the fact that Connor hid victim for one whole day before killing her), *cert. denied,* 535 U.S. 1103, 122 S. Ct. 2308, 152 L. Ed. 2d 1063 (2002).

The mental mitigation evidence Nelson presented did little to impact the finding of the CCP aggravator. For example, the defense mental health expert, Dr. Dee, testified that Nelson told him that he was seeing things on the day of the murder; however, Nelson did not tell him that he was hearing things on the day of the murder. Additionally, Nelson told police that after he kidnapped Brace and it was still dark outside, he deliberately stopped to get gas. Similarly, Dr. Dee testified that Nelson related to him that while driving around with Brace in the trunk, Nelson stopped and bought himself a cup of coffee. **As evaluated by the trial court, Dr. Dee's testimony that Nelson was prone to being impulsive and that he was angry and scared during the time period of the murder is simply not consistent with the actions of someone who drove around for hours with a live person in the trunk, even stopping during that time to get gas and coffee.**

**The persistent and somewhat time-consuming manner in which Nelson killed Brace with makeshift weapons at the orange grove also appears to support a finding of CCP.** The trial court *cited Willacy v. State*, 696 So. 2d 693 (Fla. 1997), to support its finding that the two trips Nelson made to the car (a distance of 175 feet one way) so that he could obtain additional weapons with which to kill her indicated CCP. In the instant case, there was evidence that Nelson used multiple means to try to kill Brace. The trial court properly found that the type of repeated effort to kill Brace supported a finding of CCP. *See Ford v. State*, 802 So. 2d 1121, 1133 (Fla. 2001) (holding that CCP was supported by the facts that in the course of events, Ford had to stop to reload his rifle and that during the course of the murders, Ford assaulted the victims with three different weapons: a gun, a blunt instrument such as an ax, and a knife), *cert. denied*, 535 U.S. 1103, 122 S. Ct. 2308, 152 L. Ed. 2d 1063 (2002).

*Nelson*, 850 at 527-28 (emphasis added). Given these facts, Nelson has not and cannot demonstrate by clear and convincing evidence that the state court's ruling on the CCP claim was erroneous.

Ground three does not warrant habeas corpus relief.

**GROUND FOUR**

The trial court erred by failing to consider and weigh several unrebutted mitigating circumstances that were clearly established.

On direct appeal to the Florida Supreme Court, Nelson asserted that the trial judge erred in failing to find numerous mitigating circumstances, and asserted that the court's sentencing order violated the Eighth Amendment. (See Ex. A28 at 70-94; 73 n. 28.) Nelson repeats certain factual allegations made by appellate counsel in his Initial Brief filed in the Florida Supreme Court and claims that the trial judge erred in failing to find the "impaired capacity" mitigating factor.[16] In his accompanying memorandum of law, Nelson asserts that the "trial court erred by failing to find either of the statutory mental mitigators, and many of the proposed nonstatutory mitigators that were clearly established by unrebutted evidence."

Arguably the only claim properly before this Court is Nelson's allegation that the trial court's failure to find the "impaired capacity" mitigating factor was erroneous. However, the Court will address the Florida Supreme Court's analysis of the entire claim as raised by Nelson in his direct appeal.

In rejecting Nelson's claim, the Florida Supreme Court stated:

Nelson claims that the trial court failed to consider and to properly weigh the statutory and nonstatutory mitigating circumstances presented during the penalty phase. We address each of the claimed mitigators in turn.

The trial court found that the defendant's age at the time of the murder, 21, was not a mitigating factor. In the case at bar, the trial court did not make a qualitative statement that referred to Nelson as "mature" or "independent," but its brief finding of facts and citation to *Kokal v. State*, 492 So. 2d 1317, 1319 (Fla. 1986) (defendant was 21 years of age and

---

[16] Despite challenging the trial judge's rejection of numerous mitigating circumstances on appeal, Nelson only specifically mentions the rejection of the "impaired capacity" mitigator in his federal habeas petition. (Doc. 1 at 11-13).

immature), appear to indicate a finding that Nelson was a capable and self-sufficient adult at the time of the murder. In the sentencing order, the trial court stated that the age mitigator was not found because there was evidence that Nelson had voluntarily dropped out of high school after ninth grade, spent a year in the Job Corps in Kentucky, served time in prison, and was living on his own.

In *Shellito v. State*, 701 So. 2d 837 (Fla. 1997), we held: "[W]henever a murder is committed by a minor, the mitigating factor of age must be found and weighed but that the weight can be diminished by other evidence showing unusual maturity." *Id.* at 843. However, where the defendant is not a minor, as in the instant case, "no per se rule exists which pinpoints a particular age as an automatic factor in mitigation." *Id.* The existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing. *See id.* For example, this Court has held that age twenty, in and of itself, does not require a finding of the age mitigator. *See Garcia v. State*, 492 So. 2d 360, 367 (Fla. 1986).

In *Gudinas v. State*, 693 So. 2d 953 (Fla. 1997), we held, "Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof at the time of the murders." *Id.* at 967. In that case, we found that there was substantial, competent evidence in the record to support the trial court's finding "that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator." *Id.*

The record herein supports the trial court's rejection of this mitigator because there was additional evidence of Nelson's functioning as a mature adult: he obtained and temporarily held a job; he provided his child's mother with money to buy necessities when she was visiting; Nelson did not have a home of his own, but arranged to stay with Leila Eiland, Juldy Bolton, or Reagis Ishmael; and Nelson did not have a driver's license or a car, yet was able to travel places on his own. *See Hurst v. State*, 819 So. 2d 689, 698 (Fla. 2002) (holding that the evidence did not support a finding that a non-minor suffered from mental and emotional problems sufficient to warrant age as a mitigator and noting that Hurst owned his own car, performed adequately in school, and helped with child care within his family).

The defense mental health expert, Dr. Dee, testified that Nelson had an IQ of 79, that he had memory impairment, and that his higher mental abilities were grossly affected. However, there was no additional testimony that Nelson was "immature" for someone his age, or that his emotional age was less than his chronological age. *See, e.g., Mahn v. State*, 714 So. 2d 391, 400 (Fla. 1998) (holding that age was a mitigating circumstance where

defendant's long history of substance abuse, mental and emotional instability, and passivity in the face of mental and physical abuse provided the essential link between defendant's age and immaturity); *Campbell v. State*, 679 So. 2d 720, 725-26 (Fla. 1996) (finding that the trial court erred in not giving requested jury instruction on age as a mitigating circumstance when a psychological expert testified that although the defendant was 21, his emotional age was "somewhere in the adolescent range").

## EXTREME DISTURBANCE MITIGATOR

The trial court also concluded that the extreme mental or emotional disturbance mitigator was not proven. In the sentencing order, the trial court found the mental health expert's testimony on this issue not to be credible, and to be inconsistent with other, more credible, evidence. This Court has defined the circumstances under which a trial court may reject a mitigator:

> Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved if the record contains competent substantial evidence to support the trial court's rejection of the mitigating circumstance.

*Spencer v. State*, 645 So. 2d 377, 385 (Fla. 1994) (citation omitted).

We considered the issue of expert opinion testimony in *Walls v. State*, 641 So. 2d 381 (Fla. 1994), stating:

> Walls contends that the trial court improperly rejected expert opinion testimony that he was suffering extreme emotional disturbance and that his capacity to conform his conduct to the law's requirements was substantially impaired. In Florida as in many states, a distinction exists between factual evidence or testimony, and opinion testimony.
>
> ...
>
> Certain kinds of opinion testimony clearly are admissible -- and especially qualified expert opinion testimony -- but they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve.

*Id.* at 390-91 (citations omitted). Thus, the trial court was entitled to evaluate and disregard Dr. Dee's opinion if the trial court felt that the opinion was unsupported by facts. The testimony that Nelson was "seeing things" on the day of the murder, that he suffered from hallucinations, and that he suffered from depression for many years provided perhaps the most relevant evidence to support this mitigator. However, the record reflects that the source of this evidence was largely Nelson's self-reports to Dr. Dee, and that the trial court basically rejected Dr. Dee's uncontroverted expert opinion.

As the trial court stated, several witnesses who encountered Nelson before and after the murder testified that he was acting normally. The defendant's cousin, Calvin Fogle, testified that on the evening before the murder, Nelson did not appear unusual. The defendant's girlfriend, Reagis Ishmael, testified that on the evening before the murder, nothing seemed to be unusual or out of the ordinary about Nelson. Nelson's cousin, Andy Eiland, testified that he spent time with Nelson on the day before the murder from noon until 10:30 p.m. Eiland stated he observed Nelson drink one beer that evening, Nelson acted "normal," and he did not notice anything out of the ordinary. Nelson's sister and brother-in-law, Juldy Bolton and Willy Bolton, testified that when they spent the evening with Nelson on the same day the murder occurred (after the murder), everything seemed normal. Nelson came over to their house, ate dinner, and played cards with the two of them. Thus, the evidence as it unfolded at trial supported the trial court's analysis and indicated that the crimes Nelson committed were unexpected and uncharacteristic of his behavior around that time.

Nelson argues that the trial court made "misstatements" in the sentencing order regarding the extreme mental or emotional disturbance mitigator. However, even if the trial court did misstate some mitigation testimony, we find the misstatements not so substantial as to undermine the trial court's conclusion that this mitigator was not established by the greater weight of the evidence. *See Bryant v. State*, 785 So. 2d 422, 431 (Fla. 2001). The record reflects that there was competent, substantial evidence refuting the allegation that Nelson was under extreme mental or emotional disturbance.

## OTHER STATUTORY MITIGATION

The trial court also found that the mitigator that Nelson's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired was not proven.[FN11] The trial court referred to Nelson's calculated but suspicious actions, as observed by witness Steven Weir, when Nelson got the car stuck in the sand. The trial court noted that once the car was extricated, Nelson deliberately drove to another grove and took the victim 175 feet into the grove before killing her.

The trial court held: "This indicates that his capacity to appreciate the criminality of his act was not substantially impaired. He knew that his conduct was criminal and he took logical steps to conceal his actions from others."

> FN1. We note that the trial court referred to this mitigator in the sentencing order as "Capacity to appreciate the criminality of his acts and to conform to the requirements of law." Although this phrasing represents a slight misstatement from the statutory mitigator set forth in section 921.142(7)(e), Florida Statutes (1997), we conclude that the trial court's phrasing of the mitigator is harmless as the analysis in the sentencing order is equally valid regarding the proper statutory term.

Further, there was competent, substantial evidence refuting the allegation that Nelson lacked the capacity to appreciate the criminality of his acts and to conform to the requirements of law due to brain damage. As we discussed previously, the trial court was entitled to reject Dr. Dee's opinion that Nelson suffered from brain damage if it found that the facts in the case did not support the expert opinion. *See Walls*, 641 So. 2d at 390-91. Further, there was no documentation that Nelson actually suffered fetal alcohol syndrome or that he ever incurred a head injury. Evidence was presented that Nelson knew his actions were wrong. In addition to the examples cited by the trial court (Nelson's removing the victim from her house and taking her to an orange grove, concealing her presence in the trunk from the heavy equipment operator who helped him out of the sand, driving to a second orange grove, and taking the victim 175 feet into the grove), other evidence was presented at trial: Nelson replaced the screen on the outside where he climbed into Brace's home; he lied to Deputy Pope and the Avon Park police about the car being loaned to him by Brace, whom he characterized as a family friend; and he made up a fake phone number for Brace when the police asked him for her number. These purposeful actions are indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired. *See Provenzano v. State*, 497 So. 2d 1177, 1184 (Fla. 1986) (stating that Provenzano's actions on the day of the murder did not support the mitigator that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired because he concealed the weapons he carried, he put change in the parking meter, and took his knapsack out to his car instead of allowing it to be searched because it would have exposed his illegal possession of weapons).

Therefore, we affirm the trial court's evaluation and rejection of the three statutory mitigators discussed above.

NONSTATUTORY MITIGATORS

38

The trial court found that six of the twenty-one nonstatutory mitigators claimed by Nelson were not proven. Several of those mitigators were closely tied to the statutory mitigators and some of them were closely tied to each other. They are: (a) Nelson's good judgment was impaired (trial court found that brain damage evidence had already been rejected and mitigator was contrary to evidence); (b) Nelson was remorseful for his conduct (trial court found that there was "little in the record to indicate remorse"); (c) Nelson did not plan to commit the offense in advance (trial court found this is refuted by CCP aggravator being present); (d) Nelson had a troubled and neglected childhood (trial court found that "there is nothing in the record (except for one incident involving sex with his sister) that would indicate a trouble [sic] or neglected childhood"; (e) Nelson had organic brain damage (trial court stated that it previously rejected this claim); and (f) Nelson has accepted responsibility for his action (trial court stated that there was nothing in the record except Nelson's cooperation with the police, which was previously considered, to show this).

The trial court briefly addressed these mitigators in the sentencing order. The trial court determined that these mitigating factors were not supported by the evidence. This is a proper threshold determination, according to this Court's holding in *Campbell v. State*, 571 So. 2d 415 (Fla. 1990): "When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence...." *Id.* at 419 (footnote omitted). In *Bryant v. State,* 785 So. 2d 422 (Fla. 2001), this Court upheld the trial court's succinct rejection of mitigating factors in the sentencing order, stating: "The sentencing order expressly identified this mitigating factor and, while it was discussed only briefly, it is clear the court found the mitigation was not proven by the greater weight of the evidence due to the conflicting testimony." *Id.* at 433. As in *Bryant*, the trial court in this case cited to specific record evidence regarding each mitigator that it found was not supported by the evidence.

We find no merit in Nelson's argument that the trial court did not give enough weight to the remaining fifteen mitigators. In *Trease v. State*, 768 So. 2d 1050 (Fla. 2000), we reiterated well-settled law that "[t]he relative weight given each mitigating factor is within the discretion of the sentencing court." *Id.* at 1055. The trial court in this case gave at least "very little weight" to the mitigators that it found existed.

Accordingly we affirm the trial court's findings regarding the nonstatutory mitigators because the trial court did not abuse its discretion when it found that certain mitigators were not proven and when it assigned varying degrees of weight to the mitigators that were proven.

*Nelson*, 850 So. 2d at 528-32.

Nelson again makes the conclusory statement that the state court's decision was "contrary to or an unreasonable application of federal law" without presenting any specific legal argument. Nelson notes the generalized holding from the United States Supreme Court's opinion in *Eddings v. Oklahoma*, 455 U.S. 104 (1982),[17] and erroneously and vaguely alleges that the proposed "mitigating evidence was excluded from consideration." (Doc. 2 at 17). Contrary to Nelson's assertions, the trial court did not refuse to consider any mitigating evidence in violation of *Eddings* or any other United States Supreme Court decision; rather, the state trial court specifically considered and evaluated all of the proposed mitigating evidence, but rejected some of the mitigating factors because the evidence did not support the mitigation.  As the Florida Supreme Court properly noted on appeal, the state trial court judge did not err in rejecting "these mitigators based on the evidence."  Nelson has failed to establish that the state court's decision on this issue is contrary to, or an unreasonable application of, clearly established federal law.

Ground four does not warrant habeas corpus relief.

## GROUND FIVE

A sentence of death in this case is disproportionate when compared to other capital cases in which the Defendant was mentally disturbed.

Nelson alleges that his death sentence is not proportionate to other cases and asserts that the Florida Supreme Court's finding of proportionality was contrary to *Lockett*

---

[17] In *Eddings*, the Court held "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings,* 455 U.S. at 114-15.

*v. Ohio*, 438 U.S. 586 (1978).  This claim has no merit.  The United States Supreme Court has expressly recognized that proportionality review is not required by the federal constitution. *Pulley v. Harris*, 465 U.S. 37, 44 (1984). In *Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983), the Eleventh Circuit stated:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

In denying Nelson's proportionality claim, the Florida Supreme Court stated:

> Nelson claims that the imposition of a death sentence in this case is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See *Porter v. State*, 564 So. 2d 1060, 1064 (Fla. 1990). This Court reviews and considers all the circumstances in a case relative to other capital cases when deciding whether death is a proportionate penalty and to ensure uniformity. *See Johnson v. State*, 720 So. 2d 232, 238 (Fla. 1998); *Urbin v. State*, 714 So. 2d 411, 416-17 (Fla. 1998). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. *See Kramer v. State*, 619 So. 2d 274, 278 (Fla. 1993).
>
> We find that the death penalty was not a disproportionate sentence in this extremely aggravated case, as compared to other similar cases that this Court has decided. Importantly, the trial court found that the HAC and CCP aggravators were present in this case, and this Court has previously held that they "are two of the most serious aggravators set out in the statutory sentencing scheme, and, while their absence is not controlling, it is also not without some relevance to a proportionality analysis." *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999).
>
> In *Bowles v. State*, 804 So. 2d 1173 (Fla. 2001), this Court affirmed death as a sentence when the aggravators were: (1) prior conviction of two violent felonies; (2) defendant was on felony probation when the murder was committed; (3) the murder was committed during a robbery and for pecuniary gain (merged); (4) HAC; and (5) CCP. *See id.* at 1175. The trial court in that case rejected the statutory mitigators of extreme emotional disturbance and the defendant's diminished capacity to appreciate the criminality of his acts at the time of the murder. *See id.* at 1176. The trial court assigned weight to

the following mitigating factors: (1) abusive childhood (significant weight); (2) defendant's history of alcoholism (some weight); (3) defendant's lack of a father figure (some weight); (4) defendant's lack of education (little weight); (5) defendant's guilty plea and cooperation with police (little weight); (6) defendant's use of intoxicants at the time of the murder (little weight); and (7) the circumstances which caused Bowles to leave home or his circumstances after he left home (no weight). *See id.*

In *Connor v. State,* 803 So. 2d 598 (Fla. 2001), this Court affirmed the death sentence, even in light of the avoid arrest aggravator being stricken. *See id.* at 612. In that case, the remaining aggravators were: (1) CCP; (2) HAC; (3) murder committed while engaged in a kidnapping; and (4) previous capital felony. *See id.* at 604. The trial court did not find any statutory mitigators in that case, but it did find four nonstatutory mitigators: (1) defendant suffered from a mental illness at the time of the crime; (2) defendant was a good father; (3) defendant would die in prison if given a life sentence; and (4) defendant had no disciplinary problems in prison. *See id.*

Based on the totality of the circumstances in this case considered in light of this Court's prior decisions in other capital cases involving similar circumstances, we find that death is a proportionate penalty in this case.

*Nelson*, 850 So. 2d at 532-33. The Florida Supreme Court's determination that Nelson's death sentence was not disproportionate was neither contrary to, or an unreasonable application of, clearly established federal law. Moreover, the state court's decision did not rest on an unreasonable determination of the facts.

Ground five does not warrant habeas corpus relief.

## GROUND SIX

Petitioner's Constitutional rights under the 6th, 8th, and 14th Amendments of the United States Constitution and the corresponding amendments to the Florida Constitution were violated during the guilt and penalty phases of his trial. Trial counsel was ineffective in failing to move for a determination of competency to proceed and the trial court erred in not conducting a hearing to determine if Petitioner was competent to proceed.

Nelson reasserts the arguments made in his state court postconviction motion and alleges that his trial counsel, or the trial court sua sponte, should have inquired into

Nelson's competency to stand trial. (Doc. 1 at 16-19; Doc. 2 at 20-29).

<u>Ineffective Assistance of Trial Counsel Claim</u>

After conducting an evidentiary hearing on this procedural due process claim, the state trial court issued a detailed order denying the claim. (Ex. C9:1389-1462). On appeal, the Florida Supreme Court rejected Nelson's ineffective assistance of counsel claim because Nelson failed to demonstrate deficient performance as required by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). See *Nelson v. State*, 43 So. 3d 20, 27-30 (Fla. 2010).

In his federal petition,  Nelson argues that the Florida Supreme Court's rejection of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of, clearly established federal law. Once again, Nelson has failed to specifically allege how the state court's decision was contrary to, or an unreasonable application of, clearly established federal law and fails even to identify the clearly established law. A review of the Florida Supreme Court's opinion establishes that the court properly applied the United States Supreme Court's precedent in *Strickland* to Nelson's ineffective assistance of counsel allegations and denied this aspect of the claim because Nelson failed to establish that his trial counsel performed deficiently. *See Nelson*, 43 So. 3d at 27-28 (setting forth the applicable legal standards governing Nelson's ineffective assistance of counsel claim).

 In addressing this claim, the Florida Supreme Court stated:

> Nelson's first ineffective assistance claim asserts that trial counsel failed to move for a competency determination. Nelson contends that his suicide attempt and the opinion of the defense mental health expert that he was marginally competent placed trial counsel on notice that Nelson's competency to proceed was at issue. However, because Nelson is unable to demonstrate that trial counsel was deficient, the postconviction court properly denied this claim.

In *Futch v. Dugger*, 874 F.2d 1483 (11th Cir. 1989), the United States Court of Appeals for the Eleventh Circuit considered an ineffective assistance claim regarding trial counsel's failure to determine the petitioner's competency to stand trial. *Id.* at 1486. The court stated, "In order to demonstrate prejudice from counsel's failure to investigate his competency, a petitioner has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial.'" *Id.* at 1487 (quoting *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988)). **Here, the record demonstrates that Nelson's trial counsel were experienced in handling capital cases and deemed Nelson competent to proceed based on Dr. Dee's evaluation and through their own contacts with Nelson. Trial counsel indicated during the evidentiary hearing that, based on face-to-face dealings with Nelson, it was never deemed necessary to move for a competency determination. Trial counsel also indicated that they would have filed a motion for a competency determination if Dr. Dee had clearly indicated that Nelson was incompetent. In addition, once the court ordered a competency determination, Nelson was found to be competent and capable of assisting his attorneys. Nelson's reliance on Dr. Dee's testimony that Nelson was "marginally competent" appears to be misplaced because neither the allegation nor the record demonstrates that Dr. Dee ever deemed Nelson incompetent to proceed. Further, nothing in the record indicates that Nelson was incompetent at the time of trial or at the time of the murder.**

Also, Nelson alleges that his suicide attempt alone was sufficient to raise a question about his competency to stand trial. However, no such presumption exists. In *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), the United States Supreme Court suggested that while a suicide attempt is an indication of possible mental instability, it alone does not necessarily create a reasonable doubt about a defendant's competency to stand trial. *Id.* at 180, 95 S. Ct. 896. **Trial counsel testified that Nelson met with the defense team regularly and understood the factual and procedural elements of the case and the charges against him and the roles of the judges and the lawyers. Also, trial counsel indicated that Nelson's suicide attempt was heavily considered when determining whether to raise the issue of competency, but it was their opinion that it did not necessarily render him incompetent**.

Furthermore, the administration of Mellaril, a powerful antipsychotic drug, did not necessarily render Nelson incompetent. In *Groover v. State*, 574 So. 2d 97 (Fla. 1991), we reviewed a similar issue where the petitioner raised an ineffectiveness of counsel claim for counsel's failure to request a psychiatric evaluation after it became clear prison officials had administered

large doses of Mellaril. *Id.* at 98. The postconviction court determined that there had been no sufficient evidence of incompetency, deficient performance of counsel, or prejudice where trial counsel testified there was no genuine issue of sanity or indication the defendant was suffering from diminished capacity. *Id.* at 98-99. We agreed, stating, "Where there is no evidence calling a defendant's competency into question, counsel is not bound to seek an evaluation...." *Id.* at 99 (citing *Blanco v. Wainwright*, 507 So. 2d 1377 (Fla. 1987)). Thus, while the administration of Mellaril warrants an evidentiary hearing when a postconviction claim of ineffective assistance of counsel is raised for failure to seek a competency determination, Mellaril is not per se evidence of incompetency. Accordingly, trial counsel cannot be said to have performed below an objective standard of reasonableness or that trial counsel's performance was unreasonable under prevailing professional norms.

Because Nelson has not demonstrated deficiency of his trial counsel, we need not address prejudice. *See, e.g., Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001); *Maxwell*, 490 So. 2d at 932 ("A court considering a claim of ineffectiveness of trial counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.").

*Nelson,* 43 So. 3d at 29-30 (emphasis added).

At the state court postconviction evidentiary hearing, Attorney Trogolo, Nelson's lead trial counsel, testified that he had extensive experience in dealing with competency issues while working with the Public Defender's Office. Trogolo testified that during his representation of Nelson, he and the other members of the defense team met with Nelson regularly, usually weekly or bi-weekly. While Nelson was incarcerated, Nelson gave factual statements to the defense team regarding the crime.  These statements were consistent with the statements he gave to law enforcement officers during his taped confession. As the state trial court noted,  Trogolo testified that Nelson knew "factually what was going on as far as the case against him and the proceedings that were going on. . . . [and] understood the charges against him, the roles of the judges and the lawyers." (Ex. C9:1442).

Trogolo provided his mental health expert, Dr. Dee, with a large amount of documentation regarding Nelson, and Dr. Dee opined that Nelson was "marginally competent." Trogolo testified that he considered Nelson's suicide attempt, the administration of psychotropic medication in jail, and Dr. Dee's opinion finding Nelson marginally competent when making his decision not to file a motion for competency determination. Although Nelson was often quiet when they met, Trogolo felt that Nelson never reached the point where Trogolo needed to move for competency determination because Trogolo, like Dr. Dee, found Nelson to be competent.

As the state courts properly found, based on this evidence, Nelson failed to meet his burden of establishing ineffective assistance of trial counsel for failing to move for a competency determination. The fact that Nelson was taking psychotropic medication and had attempted suicide while in jail did not *per se* render him incompetent. *See Drope v. Missouri*, 420 U.S. 162 (1975) (noting that a suicide attempt is an indication of possible mental instability, but such an attempt does not legally create a reasonable doubt about the defendant's competence to stand trial); *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995); *Fallada v. Dugger*, 819 F.2d 1564, 1569 (11th Cir. 1987); *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976). Trogolo, an experienced trial counsel, acted within the broad range of reasonably competent performance under prevailing professional standards when he made a determination that his client was competent to proceed to trial based on all of the surrounding circumstances. In making this determination, Trogolo had the benefit of the opinion of experienced mental health expert, Dr. Dee, that Nelson was competent; the opinion and testimony of jail psychiatrist, Dr. Ashby, at the pre-trial hearing that Nelson was under medication but competent (Ex. A15:1369-1450); and his own dealings with his client.

<u>Trial Court's Obligation To Order a Competency Hearing</u>

In his state court postconviction proceedings, in addition to arguing that trial counsel was ineffective for failing to file a motion for a competency determination, Nelson alleged that the trial court had an obligation to sua sponte order a competency hearing. *See Pate v. Robinson*, 383 U.S. 375 (1966) (placing burden on trial court, on its own motion, to make inquiry into defendant's competency when there is a "bona fide doubt" as to his competency). Nelson asserts that at a pretrial conference on March 11, 1999, a defense attorney filling in for Trogolo made the following comments to the trial court which put the court on notice of the necessity for a competency hearing:

> MR. MACK: Judge, I'm covering this for Mr. Trogolo. There was just a couple [of] points Mr. Trogolo asked me to advise the court of. One was that we've had our client seen by an expert advisor, and apparently he found our client to be marginally competent at this time.
>
> THE COURT: Okay.
>
> MR. MACK: However, he did say that he's recommending that a second expert advisor be involved on this, and Mr. Trogolo intends to follow through on that.

(Ex. A1:52-53).

The Florida Supreme Court found Nelson's *Pate* claim procedurally barred because such a claim "can and must be raised on direct appeal." *Nelson*, 43 So. 3d at 33 (quoting *James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir. 1992)). The *Nelson* Court stated:

> Next, Nelson argues that the trial court erred by failing to sua sponte order a competency hearing. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), held that once the question of competency is raised, there is a constitutional entitlement to a hearing on the issue of competency. Also, *Pate* established a rebuttable presumption of incompetency upon a showing that the trial court failed to hold a competency hearing despite information raising a bona fide doubt as to the petitioner's competency. *See James*, 957 F.2d at 1570. However, *Pate* claims "can and must be raised on

47

direct appeal." *Id.* at 1572. Accordingly, this claim is procedurally barred because Nelson raised no such claim in his direct appeal.

Because the Florida Supreme Court relied on an adequate and independent state procedural bar to reject Nelson's claim, this Court is precluded from reviewing the claim. *Harris v. Reed*, 489 U.S. 255, 262 (1989).

Even if this Court were to address Nelson's procedurally barred claim, the record clearly establishes that the trial court did not ignore any facts raising a "bona fide" doubt as to Nelson's competency to stand trial. *See James v. Singletary*, 957 F.2d 1562, 1571-72 (11th Cir. 1992) (noting that a petitioner bears the burden of showing that the trial court should have sua sponte conducted a competency hearing). Immediately prior to the opening statements in Nelson's trial, defense counsel requested a special jury instruction informing the jury that Nelson was taking psychotropic medication. During the discussion regarding this instruction, the state trial court heard testimony from jail psychiatrist, Dr. Ashby. (Ex. A15:1362-1449). Trogolo made numerous comments during this discussion that clearly established that Nelson was in fact competent to proceed at the time, and that counsel was not requesting a determination of competency. (Ex. A15:1363-65, 1400-01, 1404, 1446).

A review of the state trial court record establishes that nine months prior to Nelson's trial, the state trial court was made aware that trial counsels' retained mental health expert had found Nelson competent to proceed. Then, immediately before opening statements, defense counsel again informed the trial court that Nelson was competent to proceed and further informed the court that Nelson was taking medication so that Nelson could maintain his competency. The state trial court heard testimony from another mental health expert,

jail psychiatrist Dr. Ashby, which further established that Nelson was competent at that time. Nelson did not engage in any bizarre behavior at trial.  The state trial court was aware that Nelson suffered from depression and had attempted suicide over a year before trial while Nelson was incarcerated in jail.

Contrary to the assertions in Nelson's petition, the discussions on the record prior to trial did not require the trial court to sua sponte conduct a competency hearing. As the record clearly establishes, and as the state trial court properly found when denying this sub-claim, "[d]efense counsel did not ask for a competency determination, and the trial court did not have any significant information before it that would indicate that a competency determination was necessary."  (Ex. C9:1443). Thus, based on this record, even if this Court were to address Nelson's claim on the merits, there can be no showing that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, or involved an objectively unreasonable determination of the facts.

Ground six does not warrant habeas corpus relief.

## GROUND SEVEN

Petitioner was denied his substantive due process rights under the 6th, 8th, and 14th Amendments to the Constitution of the United States and the corresponding provisions of the Florida Constitution because Petitioner was tried and convicted while mentally incompetent.

In contrast to the procedural due process competency claim presented in ground six, Nelson asserts a substantive due process claim that he was tried while mentally incompetent. *See Medina v. Singletary*, 59 F.3d 1095 (11th Cir. 1995); *James v. Singletary*, 957 F.2d 1562 (11th Cir. 1992). Nelson raised this claim in his postconviction motion, and the state trial court denied the claim after conducting a competency hearing and an

49

evidentiary hearing.[20] (Ex. C9:1444). On appeal, the Florida Supreme Court affirmed the

denial of this claim, stating:

> Nelson next alleges that he was denied substantive due process because he was tried and convicted while mentally incompetent. This issue fails for two reasons. First, the issue is procedurally barred because he failed to raise it on direct appeal. Second, the record establishes that Nelson was competent at the time of the trial.

> "[A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992). "A defendant is considered competent to stand trial if 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and [if] he has a rational as well as factual understanding of the proceedings against him.'" *Id.* at 1574 (quoting *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)). "In order to make out his substantive incompetency claim, petitioner need not ... allege any error on the part of any state actor." *James*, 957 F.2d at 1572. "[A] petitioner is entitled to an evidentiary hearing on a substantive incompetency claim if he or she 'presents clear and convincing evidence to create a real, substantial and legitimate doubt' as to his or her competency." *Id.* at 1573 (quoting *Fallada v. Dugger*, 819 F.2d 1564, 1568 n.1 (11th Cir. 1987)).

> Unlike the petitioner in *James*, Nelson has had an evidentiary hearing on his postconviction incompetency claim as well as a competency determination. In both, the court has found Nelson competent. Specifically, the postconviction court denied this claim, stating, "The fact that Mr. Nelson had once tried to commit suicide and was on psychotropic medication does not mean he was incompetent or that the court was required to order a competency evaluation. The evidence supports a conclusion that the Defendant was competent at the time of trial." Thus, Nelson has not

---

[20] Nelson does not seek an evidentiary hearing on his competency claim in this Court, or an evidentiary hearing on any of his habeas claims. Nelson is not entitled to a hearing on this, or any other claim.

When Nelson claimed incompetence to proceed in his state postconviction proceedings, the state trial court conducted a competency hearing, heard testimony from three mental health experts, and found Nelson competent. (Ex. C7:1032-38). This Court is required to presume that the state court finding of competency is correct. See *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); 28 U.S.C. § 2254(e)(1).

demonstrated that he was denied due process at any level of the proceedings against him. Accordingly, Nelson is not entitled to relief on this claim.

*Nelson*, 43 So. 3d at 33.

Although the Florida Supreme Court found this claim procedurally barred under state law, Eleventh Circuit precedent holds that a substantive competency claim generally cannot be procedurally defaulted. *See Johnston v. Singletary*, 162 F.3d 630, 637 (11th Cir. 1998).[21]

On the merits, Nelson's substantive competency claim fails. In *James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir. 1992), the court noted that when a petitioner presents a substantive claim of incompetency, he must present clear and convincing evidence raising a "real, substantial and legitimate doubt" as to his competency. In this case, Nelson has failed to allege facts sufficient to warrant any inquiry into his competency.

As noted by the state courts, although Nelson "had once tried to commit suicide and was on psychotropic medication does not mean he was incompetent or that the court was required to order a competency evaluation. The evidence supports a conclusion that the

_____

[21] In *Johnston*, Petitioner Johnston raised a separate challenge to the district court's finding that he was competent to stand trial. The district court, relying on the Florida Supreme Court's determination that Johnston's substantive competency claim was procedurally barred for failure to raise the issue on direct appeal, found the claim to be procedurally barred on federal habeas review; in the alternative, the district court concluded that the state court's findings regarding competency were entitled to deference and fairly supported by the record. Eleventh Circuit case law regarding substantive competency claims raised in collateral proceedings establishes, however, that "the procedural default rule of *Wainwright v. Sykes* ... does not operate to preclude a defendant who failed to ... pursue a claim of competency on direct appeal from contesting his competency to stand trial and be sentenced through post-conviction proceedings." *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir.1985). *See also Medina*, 59 F.3d at 1107 ("The *Sykes* procedural default rule does not ... preclude review of the merits of a postconviction incompetency claim, even if the claim was not raised on direct appeal."). *Johnston*, 162 F.3d at 637.

Defendant was competent at the time of trial." *Nelson*, 43 So. 3d at 33. As previously noted in ground six, trial counsel Trogolo indicated that he did not find, based on his vast experience, a need to file a motion for competency determination given his extensive interaction with Nelson. Trial counsel met with Nelson regularly and conferred with his retained mental health expert, Dr. Dee, who also opined that Nelson was competent to proceed. In fact, when Dr. Dee met with Nelson just before trial, Nelson was clear and very forthcoming with facts, and Dr. Dee stated that it was one of their best sessions.

Dr. Ashby, the jail psychiatrist, testified on the eve of trial that Nelson was under medication to ensure his continued competency. Although the trial court and trial counsel were aware that Nelson had attempted suicide over a year before his trial and was taking psychotropic medication, this awareness does not equate to a finding that Nelson was incompetent to proceed, nor does it satisfy the difficult standard set forth in *James* to present "clear and convincing evidence raising a substantial doubt" as to Nelson's competency. *See also Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (concluding that a state appellate court was not unreasonable in determining there was no doubt of defendant's competency despite suicide attempt during trial because court made independent observations of defendant's demeanor and concluded he was competent).

Ground seven does not warrant habeas corpus relief.

## NELSON'S REPLY -- GROUNDS SIX AND SEVEN

In addressing grounds six and seven of his federal habeas petition, Nelson stated in his Reply (Doc. 20), that "[o]ne final matter which is very troubling about the state court opinion, and the State's Response, is the complete scarcity of any references to the evidentiary testimony of [second-chair trial counsel] Julia Williamson."

A review of Nelson's pleadings in state court establishes that he never specifically argued that co-counsel Williamson was ineffective.[22]  Rather, Nelson has always simply asserted that "trial counsel" was ineffective for failing to move for a competency determination prior to trial. Such a reference could be construed to be plural. For example, Nelson asserted in his state postconviction proceedings, among other claims, that "trial counsel" was ineffective for failing to move for a competency hearing prior to his November 1999 trial.  In his Initial Brief on Appeal to the Florida Supreme Court, Nelson alleged that trial counsel should have moved for a competency hearing prior to trial based on two incidents: (1) Nelson's suicide attempt on June 15, 1998; and (2) a statement made by attorney Mack (covering for lead counsel Robert Trogolo) at a March 11, 1999, hearing that the defense's mental health expert, Dr. Henry Dee, had found Nelson "marginally competent." (Ex. C16:35-51). Nelson did not cite to, or rely on, any testimony from co-counsel Julia Williamson in support of these claims.

In his Reply Brief to the Florida Supreme Court, Nelson **for the first time**  alerted the state court to Williamson's testimony in support of his claims that "trial counsel" was ineffective. (Ex. C18:8-15). However, as the Eleventh Circuit has repeatedly held, an appellate court may refuse to consider arguments raised for the first time in a reply brief. *See United States v. Britt*, 437 F.3d 1103, 1104-05 (11th Cir. 2006) (declining "to consider issues raised for the first time in an appellant's reply brief"); *see also, Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) ("Because he raises that argument for the first time in his

---

[22] Likewise, Nelson's federal habeas petition and memorandum on these two claims also shows a "complete scarcity of any references" to Williamson's testimony in support of Nelson's claims.

reply brief, it is not properly before us.").

Likewise, according to Florida's jurisprudence, the reply brief was "too late to raise a claim." *See e.g., General Mortgage Assoc., Inc. v. Campoio Realty & Mortgage Corp.*, 678 So. 2d 431, 431 (Fla. 3rd DCA 1996) ("The fact that this issue was raised for the first time in the reply brief alone precludes our consideration of the matter."). Thus, Nelson's failure to present the factual basis of this specific claim to the Florida Supreme Court until the Reply Brief arguably resulted in a procedural default, especially in light of Nelson's repeated failure to raise any specific reference to Williamson in this Court until his Reply.

However, even if this Court were to find that the factual allegations regarding Williamson were not procedurally barred, it is clear that the Florida Supreme Court's decision denying his ineffective assistance of "trial counsel" claim was not contrary to, or an unreasonable application of, clearly established federal law.  Attorneys Trogolo and Williamson testified at the state court postconviction evidentiary hearing regarding their respective roles and actions during their representation of Nelson. This testimony established that Trogolo, the vastly more experienced attorney,[23] was lead trial counsel for Nelson.  Williamson was assigned as co-counsel to Nelson's case approximately six months before Nelson's November 1999 trial.  Shortly before trial, it was determined that she would be primarily responsible for the guilt phase. (Ex. C7:1065-66). Trogolo testified that, as lead counsel, he had sole responsibility for making all tactical decisions after consulting with the defense team and his client. (Ex. C7:1079).

---

[23]  Trogolo became a licensed Florida attorney in 1975, began working at the Tenth Judicial Circuit Public Defender's Office in 1984; began handling first degree murder cases in the early 1980s; and represented Nelson at his 1999 trial. (Ex. C7:1085-89). In contrast, Nelson's trial was Williamson's first capital case. (Ex. C8:1189-90).

As the state court record reflects, Trogolo was aware of Dr. Dee's pre-trial finding that Nelson was competent; was aware that Nelson had attempted suicide while incarcerated a year-and-a- half before his trial; and was aware that the jail psychiatrist, Dr. Ashby, had prescribed psychotropic medication to Nelson prior to and during trial. Trogolo testified that he and the defense team never saw anything to call into question Dr. Dee's finding of competency. (Ex. C7:1105-08). During his representation of Nelson, trial counsel Trogolo met with Nelson weekly or bi-weekly. (Ex. C7:1103). Additionally, co-counsel Williamson and mitigation specialist Tony Maloney[24] also met with Nelson. (Ex. C7:1103-04). Based on his experience in dealing with criminal defendants, Trogolo was aware of the requirements for seeking a competency determination, and given his involvement with Nelson, coupled with Dr. Dee's diagnosis, trial counsel did not see a need to seek a judicial determination of competency. As trial counsel Trogolo made clear on the record at the time of trial, and reiterated at the postconviction evidentiary hearing, there was no valid claim that Nelson was incompetent to proceed at the time of his trial. (Exs. A15:1365, 1400-04, 1446; C7:1098-1108).

Williamson testified at the evidentiary hearing that she met with Nelson at least five times and he was not forthcoming with facts to her about the case. She acknowledged on cross examination that Nelson had told other members of the defense team a version of the facts similar to the full confession he gave to law enforcement. (Ex. C8:1195-98, 1232-39). Williamson claimed that, in retrospect, "knowing what she now knows," she

---

[24] Mitigation specialist Tony Maloney had a background in mental health because she had previously worked at a mental health facility and Trogolo believed she had a M.S. degree in psychology. (Ex. C7:1094).

should have requested a competency evaluation of Nelson because he was not forthcoming about the facts of the case to her. (Ex. C8:1198, 1205).

Based on counsels' testimony, the Florida Supreme Court properly rejected Nelson's claim that his trial counsel was ineffective for failing to move for a competency hearing prior to trial. (See ground six above; *Nelson,* 43 So. 3d at 29-30.)

In his Reply, Nelson repeats the same arguments previously made and rejected by the state courts, and adds that he is troubled by the lack of references to trial counsel Williamson's testimony by the Florida Supreme Court. However, Williamson's hindsight admissions did not require a finding of ineffectiveness given lead counsel Trogolo's testimony and the totality of other evidence clearly establishing that Nelson was competent at trial. *See Harris v. Dugger*, 874 F.2d 756, 761 n.4 (11th Cir. 1989) (noting that an attorney's admission of ineffectiveness is not decisive);  *Kelley v. State*, 569 So. 2d 754, 761 (Fla. 1990) (stating that an attorney's own admission of ineffectiveness is of little consequence, particularly when that assessment has been made with the benefit of hindsight). Lead counsel Trogolo had greater interaction with Nelson prior to trial, and the testimony of Trogolo and Williamson clearly establishes that Trogolo was far more informed about Nelson's case and his mental health issues than Williamson. Based on the state court record, the Florida Supreme Court properly rejected Nelson's ineffective assistance of counsel claims. Nelson has failed to establish how this finding was contrary to, or an unreasonable application of, clearly established federal law.  Nelson's Reply arguments as to grounds six and seven are not persuasive.

## GROUND EIGHT

Petitioner was deprived of his right to a reliable adversarial testing due to ineffective assistance of counsel at the guilt and penalty phases of his capital trial in violation of Petitioner's 5th, 6th, 8th, and 14th Amendment rights under the United States Constitution and Petitioner's corresponding rights under the Florida Constitution. Trial counsel was ineffective in failing to call a witness in both the guilt and penalty phases of the trial to establish that Petitioner lacked the mens rea in the guilt phase and to establish statutory mental mitigation in the penalty phase.

Nelson alleges that his trial counsel was ineffective for failing to call jail psychiatrist, Dr. Ashby, at the guilt phase to testify that Nelson did not have the *mens rea* to commit first degree murder. Nelson further asserts that effective counsel would have called Dr. Ashby at the penalty phase to establish statutory mitigation. After conducting an evidentiary hearing, the state trial court denied the claim. On appeal, the Florida Supreme Court affirmed the trial court's denial based on a finding that Nelson failed to carry his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). See *Nelson v. State*, 43 So. 3d 20, 30-31 (Fla. 2010).

In finding that Nelson failed to establish his ineffective assistance of counsel claim, the Florida Supreme Court stated:

Nelson's second ineffective assistance claim alleges that trial counsel failed to call Dr. Ashby in the guilt phase to establish that Nelson lacked mens rea and also in the penalty phase to establish statutory mental mitigation. Nelson asserts that Dr. Ashby's testimony was critical to establish his state of mind because Ashby diagnosed him with schizoaffective disorder shortly after the crime. However, for the reasons stated below, Nelson has failed to demonstrate trial counsel's deficiency and we affirm the postconviction court's denial of this claim.

Regarding trial counsel's failure to call Dr. Ashby during the guilt phase of trial, Nelson relies on *Bunney v. State*, 603 So. 2d 1270 (Fla. 1992), where we considered whether it was error for the trial court to refuse to allow testimony concerning the defendant's alleged epileptic condition absent a plea of insanity. *Id.* at 1271. We reasoned that "while evidence of diminished

capacity is too potentially misleading to be permitted routinely in the guilt phase of criminal trials, evidence of 'intoxication, medication, epilepsy, infancy, or senility' is not," and held that "evidence of certain commonly understood conditions that are beyond one's control ... should also be admissible." *Id.* at 1273. Nelson argues that his psychosis is a condition beyond his control, which was thus admissible. However, Nelson's reliance on *Bunney* is misplaced. **Our precedent has firmly established the inadmissibility of evidence relating to mental capacity absent an insanity plea.** *See, e.g., Everett v. State*, 97 So. 2d 241, 245-46 (Fla. 1957) (trial court did not err in refusing to give an instruction that the defendant's mental condition could be considered by the jury in deciding whether he was capable of forming a premeditated design even though he was not found insane); *Ezzell v. State*, 88 So. 2d 280, 282 (Fla. 1956) ("Since the plea of insanity was out and there was no defense based on mental defects less than insanity, there was no reason for ... testimony or to labor the question."). In *Chestnut v. State*, 538 So.2d 820 (Fla. 1989), we squarely addressed the admissibility of mental defects where the defendant does not raise an insanity defense. *Id.* at 820. Ultimately, we explained:

> If [alleged] mental deficiencies are sufficient to meet the definition of insanity, these persons should be acquitted on that ground and treated for their disease. Persons with less serious mental deficiencies should be held accountable for their crimes just as everyone else. If mitigation is appropriate, it may be accomplished through sentencing, but to adopt a rule which creates an opportunity for such persons to obtain immediate freedom to prey on the public once again is unwise.

*Id.* at 825. **Therefore, because Nelson did not raise an insanity defense, counsel cannot be found deficient for failing to call Dr. Ashby in the guilt phase.**

Nelson has likewise failed to demonstrate counsel's deficiency at the penalty phase. The postconviction court denied this claim, noting that Dr. Dee testified extensively in the penalty phase with regard to Nelson's mental state and applicable mitigating factors. The record demonstrates that Nelson received the benefit of penalty phase testimony from Dr. Dee, whose testimony was more extensive than what could have been offered by Dr. Ashby. Trial counsel retained Dr. Dee, a trained forensic neuropsychologist, to testify during the penalty phase. Though Dr. Ashby did not examine Nelson for the purpose of presenting mitigating evidence, Dr. Dee did. Further, the record demonstrates that Dr. Dee had access to Dr. Ashby's records relating to Nelson. As demonstrated at the evidentiary hearing, Dr. Ashby's testimony would have been cumulative to, and much less detailed than, Dr. Dee's

testimony. Trial counsel testified that he did not give much thought to calling Dr. Ashby, who as a jail psychiatrist worked on a contract basis with the jail and had not examined Nelson for the purpose of testifying to mitigating evidence.

It is notable that Nelson does not cite a single case to demonstrate support for his claim that he is entitled to relief under *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990). In *Chambers*, trial counsel "(1) failed to interview, (2) failed to call at trial, and (3) failed to call at sentencing the only witness who would have testified that Chambers acted in self-defense." *Id.* at 826. Thus, the case is distinguishable because "[t]he decision to interview a potential witness is not a decision related to trial strategy.... It is a decision related to adequate preparation for trial." *Id.* at 828. Here, there is no allegation that Nelson's trial counsel failed to adequately prepare. Accordingly, Nelson has not demonstrated that counsel was deficient for failing to call Dr. Ashby during the penalty phase.

*Nelson*, 43 So. 3d at 30-31 (emphasis added).

As the state courts properly found, trial counsel was not deficient for failing to call Dr. Ashby at the guilt phase to testify regarding Nelson's lack of premeditation because this evidence was inadmissible under Florida law. Furthermore, even if counsel were deficient, Nelson cannot demonstrate prejudice under *Strickland* because evidence showing that Nelson lacked premeditation would not have precluded a conviction on first degree felony murder given the jury's verdicts of guilt on the underlying felonies of burglary, sexual battery, and kidnapping. (Ex. C9:1444-46).

Trial counsel Trogolo testified that he consulted with Dr. Dee about the possibility of pursuing a legal insanity defense, and determined that insanity was not a viable defense. (Ex. C7:1117-21). Because Florida law would only allow defense counsel to argue diminished capacity if counsel had raised an insanity defense, Trogolo did not even attempt to call Drs. Dee, Kremper or Ashby at the guilt phase of Nelson's trial. *See Chestnut v.*

*State*, 538 So. 2d 820 (Fla. 1989); *Gurganus v. State*, 451 So. 2d 817 (Fla. 1984).[25]

Defense counsel determined that  the better strategy was to pursue a defense theory of

arguing for second degree murder "to maintain credibility with the jury."  Because Florida

law would not allow trial counsel to present expert testimony regarding Nelson's alleged

diminished capacity at the guilt phase, and because trial counsel made a strategic decision

in pursuing a certain defense theory, trial counsel's decision not to call Dr. Ashby cannot

be deemed deficient. *See Evans v. State*, 946 So. 2d 1, 11 (Fla. 2006) (stating that trial

counsel cannot be ineffective for failing to seek to introduce evidence of a meritless

defense, diminished capacity, at the guilt phase); *Occhicone v. State*, 768 So. 2d 1037,

1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel

if alternative courses have been considered and rejected and counsel's decision was

reasonable under the norms of professional conduct."). Based on the testimony from trial

counsel at the postconviction evidentiary hearing, the state courts properly found that

Nelson failed to "surmount *Strickland*'s  high bar" of showing deficient performance and

prejudice.

Likewise, the state courts properly found that Nelson failed to show that counsel was

ineffective for failing to call Dr. Ashby at the penalty phase or at the *Spencer* [26] hearing.

---

[25] In Florida, courts follow the *M'Naghten* Rule for determining whether a defendant was insane at the time of the crime. *Gurganus*, 451 So.2d at 820. Under *M'Naghten*, an accused is not criminally responsible for his actions if, at the time of the offense, the accused, by reason of a mental disease or defect, (1) does not know of the nature or consequences of his act; or (2) is unable to distinguish right from wrong. *Id.*

[26]  *See Spencer v. State*, 615 So. 2d 688, 690-92 (Fla. 1993). *Spencer* outlines the proper sentencing phase procedure to be followed in death cases; it also emphasizes the role of the circuit judge over the trial jury in the decision to impose a sentence of death:

Trogolo testified at the state postconviction evidentiary hearing that he "did not give much thought" to calling Dr. Ashby, a jail psychiatrist,[27] in the penalty phase because he had retained Dr. Dee, a mental health expert with a "tremendous amount" of experience in capital cases, to examine Nelson for the specific purpose of presenting mitigation evidence to the jury. (Ex. C7: 1100-01). Trogolo retained Dr. Dee for the penalty phase and provided him with a voluminous amount of background material from Dr. Ashby, including the jail records. As the state courts properly found, trial counsel was not deficient for choosing to utilize his forensic expert neuropsychologist, Dr. Dee rather than the jail psychiatrist, Dr. Ashby, at the penalty phase proceeding.  Nelson has failed to show that the state court's resolution of this claim was contrary to, or an unreasonable application of, clearly

---

First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person. Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence. If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes (1983), the judge must set forth in writing the reasons for imposing the death sentence. Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order.

It is the circuit judge who has the principal responsibility for determining whether a death sentence should be imposed. Capital proceedings are sensitive and emotional proceedings in which the trial judge plays an extremely critical role.

615 So.2d at 690–91.

A transcript of the *Spencer* hearing in Nelson's case is found at Exhibit A6, pp. 930-1032.

[27] Dr. Ashby did not examine Nelson for the purpose of presenting mitigation evidence.  Dr. Ashby was a contract jail psychiatrist.

established federal law.

Ground eight does not warrant habeas corpus relief.

## GROUND NINE

Petitioner was deprived of his right to a reliable adversarial testing due to ineffective assistance of counsel at the penalty phase of his capital trial, in violation of his 5th, 6th 8th, and14th Amendment rights under the United States Constitution and his corresponding rights under the Florida Constitution. Trial counsel was ineffective in the investigation and preparation of the penalty phase. Trial counsel failed to call a witness to establish statutory mitigation in the penalty phase.

Nelson alleges that trial counsel was ineffective for failing to properly investigate and prepare for the penalty phase and for failing to call Dr. Kremper, or a similar expert, to testify regarding the existence of mental mitigation. After conducting an evidentiary hearing on Nelson's claim, the state trial court denied Nelson's claim and found that Nelson had failed to meet his *Strickland* burden of establishing deficient performance and prejudice. (Ex. C9:1447). The Florida Supreme Court affirmed the denial of postconviction relief, stating:

Nelson's third ineffective assistance claim alleges that trial counsel was deficient for failing to secure a qualified psychiatrist to evaluate the report of Dr. Kremper and testify regarding Nelson's mental health history. Nelson asserts that such testimony would have established that his mental illness was evident at an early age. **Trial counsel made the decision not to present Dr. Kremper's testimony to prevent the jury from hearing Nelson's prior bad conduct regarding sexual battery and lewd assault on a family member. We agree with the postconviction court that this decision was reasonable and deny this claim**. We confronted this issue in *Sexton v. State*, 997 So. 2d 1073 (Fla. 2008), where we considered whether trial counsel was deficient for choosing not to present testimony from Dr. Maher that the defendant had a history of bizarre sexual and criminal behavior. *Id.* at 1082-84. Trial counsel's theory was to demonstrate brain damage as documented by a PET scan instead of behavior that "would be so inflammatory to the jury that it would counteract any possible mitigation." *Id.* at 1084. Trial counsel reasoned that "Dr. Maher's description of Sexton as

a sadistic sexual psychopath, if heard by the jury, would be 'tantamount to stipulating to death.'" *Id.* We affirmed the postconviction court's order denying relief on this claim, finding that penalty phase counsel had made an informed strategic decision and that Sexton failed to demonstrate that counsel was deficient. *Id.* at 1085.

Also, in *Willacy v. State*, 967 So. 2d 131 (Fla. 2007), we confronted a similar issue where we considered whether it was ineffective assistance for counsel to avoid presenting evidence that the defendant was a sociopath. *Id.* at 143. We found that the postconviction court's finding was supported by competent, substantial evidence and that counsel made a reasonable strategic choice, after investigation, to forego presentation of negative mitigating evidence. *Id.* at 144. We held that Willacy "[had] not shown prejudice because presenting [the] mitigating evidence 'would likely have been more harmful than helpful.'" Id. (quoting *Evans v. State*, 946 So. 2d 1, 13 (Fla. 2006)).

As illustrated, **it is reasonable for trial counsel to forego evidence that, if presented in mitigation, could damage a defendant's chances with the jury.** Further, as we stated in *Stephens v. State*, 975 So. 2d 405 (Fla. 2007), "[B]eing able to secure an expert witness to provide an opinion as to mental health mitigation during postconviction proceedings, which arguably could have been helpful ... does not, in and of itself, render trial counsel's performance ineffective." *Id.* at 415. **Thus, trial counsel's decision not to present testimony that would have opened the door to Nelson's incestuous rape of his minor cousin cannot be deemed deficient. Because Nelson cannot demonstrate deficiency, we need not address whether he was prejudiced.**

*Nelson,* 43 So. 3d at 31-32 (emphasis added).

At the state court evidentiary hearing, Trogolo testified that he made a strategic decision not to present Dr. Kremper's testimony after consulting with the doctor, because the jury would have heard about "bad conduct" regarding Nelson's character. Dr. Kremper examined Nelson when Nelson was sixteen years old in connection with his charges of sexual battery and lewd assault on a family member. Trial counsel was justified in not wanting the jury to hear about Nelson's actions of raping his five-year-old cousin vaginally, anally, and digitally, and Dr. Kremper's opinion that Nelson was in need of long term

treatment for sexual deviancy. Trial counsel conducted a thorough investigation in this case

by hiring an experienced mental health expert, Dr. Dee, and providing the doctor with

voluminous background information and records, including the report from Dr. Kremper.

(Ex. A25:3126). Trial counsel made sound strategic decisions regarding the presentation

of the mental mitigation evidence and, as the state courts properly found, counsel's

decision not to call Dr. Kremper or a similar expert does not equate to ineffective assistance

of counsel. Nelson has failed to establish that the state court's decision is contrary to, or

an unreasonable application of *Strickland* or any other United States Supreme Court case.

Ground nine does not warrant habeas corpus relief.

## GROUND TEN

Petitioner was denied the effective assistance of counsel at the sentencing phase of his capital trial, in violation of the 6th, 8th, and 14th Amendments. Trial counsel failed to request the Court [to] instruct the jury on statutory mitigators where evidence was presented on statutory mitigation in the sentencing phase of Petitioner's trial. Counsel's performance was deficient, and as a result, the death sentence is unreliable.

Nelson alleges that trial counsel was ineffective for failing to request jury instructions

on the two statutory mental mitigators. Nelson erroneously asserts that trial counsel's

strategic decision was based on ignorance of the law. In affirming the state trial court's

denial of this claim, the Florida Supreme Court properly found that Nelson's argument that

counsel was ignorant of controlling law was inaccurate:

In *Nelson*, we affirmed the trial court's rejection of the two statutory mental health mitigating circumstances, stating, "The record reflects that there was competent, substantial evidence refuting the allegation that Nelson was under extreme mental or emotional disturbance." 850 So. 2d at 530. At the evidentiary hearing, trial counsel testified he was concerned that the State would successfully argue that mitigation was not established given the modifying adjective "extreme." Trial counsel further testified that he was concerned the jury would not give proper weight to the nonstatutory

mitigation if certain mitigation was singled out as being statutory. Nelson alleges this strategy cannot be reasonable because it was based on ignorance of the controlling case law. The postconviction court found the tactical decision to be reasonable because the decision not to request the jury instructions on the two mental health mitigators did not prevent the defense from presenting mental health mitigating evidence to the jury from Dr. Dee. We agree with the postconviction court and deny this claim.

At the evidentiary hearing, trial counsel was asked whether he had read *Bryant v. State*, 601 So. 2d 529 (Fla. 1992); *Stewart v. State*, 558 So. 2d 416 (Fla. 1990); and *Smith v. State*, 492 So. 2d 1063 (Fla. 1986). **Trial counsel testified that he did not recall the cases by their names, but that if they were capital cases, he had probably either read them or read summaries of them. Trial counsel then asked collateral counsel to state what proposition they stood for. The question went unanswered, and collateral counsel moved on to another line of questioning. From this exchange, it does not appear accurate to state that counsel was ignorant of controlling case law.** The cases cited establish the right to jury instructions on the statutory mitigating circumstances of extreme mental or emotional disturbance. *See, e.g., Bryant*, 601 So. 2d at 533 ("We have previously stated that the 'Defendant is entitled to have the jury instructed on the rules of law applicable to this theory of the defense if there is any evidence to support such instructions.'") (quoting *Hooper v. State*, 476 So. 2d 1253, 1256 (Fla. 1985)). Here, **trial counsel testified that he was aware he was entitled to the instructions, but made a strategic decision not to request them, opting instead for the "catch-all" instruction. Because Nelson has not demonstrated that this decision was based on ignorance of the law as alleged, he is not entitled to relief.**

*Nelson*, 43 So. 3d at 32-33 (emphasis added).

A review of the state postconviction evidentiary hearing record establishes that trial counsel was well aware of the applicable law regarding the jury instructions, but made a strategic decision not to request specific instructions on the two statutory mental mitigating circumstances. As the Florida Supreme Court noted, Nelson's collateral counsel, without giving Trogolo any context for the question, asked if he had read three Florida Supreme Court cases: *Bryant v. State*, 601 So. 2d 529 (Fla. 1992), *Stewart v. State*, 558 So. 2d 416 (Fla. 1990), and *Smith v. State*, 492 So. 2d 1063 (Fla. 1986). Trogolo testified that he did

not recall, but if they were capital cases, he had probably either read them or read summaries of them. (Ex. C7:1071). When Trogolo asked collateral counsel to "tell me what proposition they stand for" so that he could intelligently answer the question, collateral counsel moved on to another subject. (Ex. C7:1071).

Contrary to Nelson's assertion that trial counsel's strategic decision was based on ignorance of the law, trial counsel testified that he was well aware that he was entitled to the jury instructions on the two statutory mental mitigating circumstances because he had produced evidence from Dr. Dee to support the instructions. (Ex. C7:1074-85). Trogolo explained at length, both at trial and at the evidentiary hearing, his strategic decision for not requesting the specific instructions, but rather, opting for the general "catch-all" instruction that the jury could consider any aspect of the defendant's background or character. (Exs. A24:2917-24; C7:1076-82). Trogolo testified that he was afraid the prosecutor would argue to the jury that the defense had not established the statutory mitigators given the modifying adjectives of "extreme" and "substantial" contained in the instructions. He feared the jury would not properly consider and weigh the mitigation evidence if the prosecutor successfully argued that it did not rise to the level of "statutory" mitigation. Trogolo testified that his decision did not prohibit him from making any arguments to the jury and did not impair the presentation of Dr. Dee's mental mitigating evidence. Furthermore, Trogolo testified that Nelson agreed with this strategy after consultation with both trial attorneys. (Ex. A24:2921-22).

The law is well established that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected. *See United States v. Oliveras*, 717 F.2d 1, 3 (1st Cir. 1983) ("[T]actical decisions, whether wise

66

or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance."). Nelson has failed to demonstrate that he is entitled to federal habeas relief based on the state courts' proper application of *Strickland* to the underlying facts. As the state courts properly found when denying this claim, Nelson failed to meet his *Strickland* burden of showing that trial counsel was deficient for making the reasonable strategic decision to forego a specific jury instruction on the two statutory mental mitigating factors. Despite vaguely claiming that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, Nelson has not attempted to meet his burden under the AEDPA.

Ground ten does not warrant habeas corpus relief.

### GROUND ELEVEN

Florida Statute 921.141 is facially vague and overbroad in violation of the 8th and 14th Amendments, and the unconstitutionality was not cured because the jury did not receive adequate guidance in violation of the 8th and 14th Amendments. The trial court's instructions to the jury unconstitutionally diluted its sense of responsibility in determining the proper sentence. Petitioner's death sentence is premised on fundamental error which must be corrected. To the extent appellate counsel failed to raise these issues, counsel was ineffective.

Nelson argued to the Florida Supreme Court in his state habeas petition that his jury was unconstitutionally instructed by the court that its penalty phase verdict was merely "advisory" thereby diminishing the jury's sense of responsibility in violation of the Eighth Amendment. (Ex. C19 at 6-7, citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985)). The Florida Supreme Court found this claim procedurally barred because it was not raised on direct appeal. *See Nelson v. State*, 43 So. 3d 20, 34 (Fla. 2010).

Nelson has not shown cause and prejudice to overcome the procedural default and

has not shown that a fundamental miscarriage of justice will occur if this Court does not address the merits of the claim. Even if Nelson's *Caldwell* claim was not procedurally barred, the claim provides no basis for federal habeas relief. In order to establish constitutional error under *Caldwell*, a petitioner must show that the comments or instructions to the jury "improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). The Eleventh Circuit has long recognized that comments describing the jury's role in Florida as making an advisory recommendation and the judge as the final sentencing authority do not present *Caldwell* error. *See Johnston v. Singletary*, 162 F.3d 630 (11th Cir. 1998); *Provenzano v. Singletary*, 148 F.3d 1327, 1334 (11th Cir. 1998). Nelson's claim is procedurally barred and without merit.

<u>Ineffective Assistance of Appellate Counsel</u>

Nelson cannot show that appellate counsel was ineffective for failing to raise the claims on appeal that Nelson raises in ground eleven of his federal petition. The Eleventh Circuit has set forth the applicable legal principles for reviewing a claim of ineffective assistance of appellate counsel.

A defendant has a right to counsel to aid in the direct appeal of his or her criminal conviction. *See Evitts v. Lucey*, 469 U.S. 387 (1985). This right to counsel is violated when appellate counsel is ineffective. *Id.; Alvord v. Wainwright*, 725 F.2d 1282 (11th Cir. 1984). This Circuit has applied the Supreme Court's test for ineffective assistance at trial, *see Strickland v. Washington*, 466 U.S. 668 (1984), to guide its analysis of ineffective assistance of appellate counsel claims. *See Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989). Therefore, Nelson must show that his appellate counsel's performance was deficient and that this performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

*Heath v. Jones,* 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992).

It is clear that "[t]he standard of proof and standard of review are the same in the context of ineffective assistance of appellate counsel as in the context of ineffective assistance of trial counsel." *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956 (1984).

The Supreme Court, on at least two occasions, has had an opportunity to explain the parameters of what constitutes a reasonable strategy for appellate advocates.  In *Jones v. Barnes*, 463 U.S. 745 (1983), the Court held that the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue.  The Court suggested that effective advocates "winnow out" weaker arguments even though the weaker arguments may be meritorious. *Id.* at 751-52. The Court in *Smith v. Murray,* 477 U.S. 527 (1986), held that an appellate advocate who reviewed the entire record, thought about various claims, and then chose to pursue thirteen claims on appeal had furnished effective appellate assistance. The Court recognized that even though a non-appealed issue might have been successful, the appellate advocacy had to be judged in its entirety. *See Heath*, 941 F.2d at 1130-31.

In *Cross v. United States*, 893 F.2d 1287 (11th Cir. 1990), the Eleventh Circuit held that in order to determine prejudice the court must first perform "a review of the merits of the [omitted or poorly presented] claim." *Id.* at 1290.  If the Court finds that the neglected claim would have a reasonable probability of success on appeal, then according to *Cross* it is necessary to find "appellate counsel's performance prejudicial because it affected the outcome of the appeal." *Id.*

In Nelson's case, his "neglected claims" have no merit.  Therefore, appellate counsel was not ineffective for failing to raise the claims.

Ground eleven does not warrant habeas corpus relief.

## GROUND TWELVE

Petitioner is denied his rights under the 5th, 6th, and 14th Amendments to the United States Constitution because Petitioner is incompetent to proceed.

In his memorandum of law in support of his petition, Nelson states that the Florida Supreme Court denied this claim, holding:

> We also deny Nelson's competency claims because they are not ripe for review and were raised solely for preservation purposes. *See State v. Coney*, 845 So. 2d 120, 137 n. 19 (Fla. 2003)(rejecting a claim that defendant was incompetent to be executed where he acknowledged that the claim was not yet ripe and was being raised only for preservation purposes). *Nelson v. State*, 43 So.3d at 34.

Nelson then claims that this decision was contrary to or an unreasonable application of federal law. Thereafter, Nelson repeats **verbatim** the arguments in his state habeas corpus petition before the Florida Supreme Court regarding his competency to proceed. (See Ex. C19:7-19; Doc. 1 at 36-43; Doc. 2 at 64-72).

Nelson argued in his state habeas petition, as he does in his federal habeas petition, that he was incompetent to proceed in his **state postconviction proceedings**. This Court must presume the state court's finding of competency to be correct. The state trial court heard testimony from three expert witnesses. After hearing this testimony, the court found that Nelson was malingering and concluded that he was competent. (Ex. C7:1032-38). A review of the testimony from the competency hearing clearly supports the state trial court's finding that Nelson was malingering and that he was competent to proceed. (Ex. C10-11:1476-1762). Nelson has failed to show by clear and convincing evidence that the state trial court's determination that he was competent to proceed is not fairly supported

70

by the record.  His claim has no merit.

Ground twelve does not warrant habeas corpus relief.

## GROUND THIRTEEN

Petitioner was denied the effective assistance of counsel, in violation of the 6th and 14th Amendments of the United States Constitution, by failing to object to the Court instructing the jury on and finding that Petitioner killed the victim to avoid a lawful arrest. The evidence failed to prove this aggravator beyond a reasonable doubt. Appellate counsel was ineffective for failing to raise this claim.

Nelson claims that his counsel was ineffective for failing to object to the trial court's instructing the jury on the avoid arrest aggravating circumstance and that his appellate counsel was ineffective for raising this issue on his direct appeal. Nelson raised this argument in his state petition for writ of habeas corpus. (Ex. C20 at 19-25). The Florida Supreme Court rejected the ineffective assistance of trial counsel portion of this claim as it was improperly raised in his state habeas petition. *See Nelson*, 43 So. 3d at 34 ("Nelson's claim that trial counsel was ineffective is denied because ineffective assistance of counsel is not cognizable in habeas corpus."). The court rejected the ineffective assistance of appellate counsel claim because the evidence supported this aggravating factor and, more importantly, Nelson's appellate counsel actually raised the issue on appeal. *See Nelson*, 43 So. 3d at 35-36.

As noted in Ground Two, *supra*, the evidence at trial, including Nelson's own confession, supported the instruction on the aggravating factor. Contrary to Nelson's assertion, his appellate counsel raised this issue on appeal to the Florida Supreme Court; thus, Nelson can claim neither deficient performance nor prejudice under *Strickland*. Because Nelson's claim of ineffective assistance of appellate counsel was properly rejected

by the Florida Supreme Court based on his failure to meet his burden under *Strickland*, the

claim has no merit.

Ground thirteen does not warrant habeas corpus relief.

## GROUND FOURTEEN[28]

Petitioner's trial was fraught with procedural and substantive errors which cannot be harmless when viewed as a whole, since the combination of errors deprived him of the fundamentally fair trial guaranteed under the 6th, 8th, and 14th Amendments. Appellate counsel was ineffective for failing to raise this claim.

Nelson asserts in one sentence that "[g]rounds one through thirteen singularly and

in the aggregate deprived Petitioner of a fair trial." (Doc. 1 at 47). In his accompanying

memorandum, Nelson asserts that he raised this claim in his state petition for habeas

corpus and notes that the Florida Supreme Court denied this claim: "Finally, Nelson's claim

that appellate counsel was ineffective for failing to raise a claim of cumulative effect on

---

[28]   Nelson raised ground fourteen in his federal petition for writ of habeas corpus.

In his memorandum of law, Nelson raises a claim **not raised in his habeas petition** as "Ground XIV." This claim **contained only in his memorandum,** addresses his competency to be executed and reasserts the claim Nelson made in his state petition for habeas corpus. The Florida Supreme Court denied this claim because it was not ripe for review. Even if this Court addresses this improperly raised claim, the law is well-settled that the claim must be dismissed as not ripe. *See Thompson v. Crosby*, 320 F.3d 1228, 1230 (11th Cir. 2003); *Hall v. Moore*, 792 So. 2d 447, 450 (Fla. 2001) (stating that, under Florida law, a defendant cannot legally raise issue of competency to be executed until after a death warrant is signed).

Likewise, Nelson presents a "Ground XVII" argument **only in his memorandum of law. Ground XVII is not included in his petition for habeas relief.** The Florida Supreme Court properly rejected Ground XVII, regarding the constitutionality of Florida's capital sentencing scheme on the basis of a valid state procedural ground and on the merits. *See Nelson,* 43 So. 3d at 34 (rejecting claim that Florida's capital sentencing statute is unconstitutional because claim was not raised on direct appeal and therefore procedurally barred).

multiple errors . . . [is] denied for lack of merit. Nelson's claim of cumulative effect is likewise without merit because each individual claim is without merit." *Nelson*, 43 So. 3d at 34. As the state trial court properly noted, none of Nelson's individual claims of error had merit; therefore, his cumulative effect assertion is also without merit. Nelson has failed to establish that the Florida Supreme Court's decision rejecting this claim was contrary to, or an unreasonable application of, clearly established federal law.

Ground fourteen does not warrant habeas corpus relief.

### GROUND FIFTEEN[29]

The Florida death sentencing statute as applied is unconstitutional under the 6th, 8th, and 14th Amendments of the United States Constitution.

Nelson asserts that he "was sentenced to death based on advisory recommendation of 9 to 3." (Doc. 1 at 49). This single factual sentence does not state a valid ground for federal habeas relief. In his accompanying memorandum of law, Nelson reasserts the arguments made in his state petition for habeas corpus relief and argues that Florida's death penalty statute is unconstitutional as applied. The Florida Supreme Court rejected this claim based on a valid state procedural bar and Nelson has not shown cause and prejudice to overcome this bar. *See Nelson*, 43 So. 3d at 34 (stating that Nelson's claim that "the Florida death sentencing statute is unconstitutional as applied" is procedurally barred because it was not raised on direct appeal).

On the merits, Nelson's claim that Florida's capital sentencing scheme is unconstitutional based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v.*

---

[29] In his memorandum of law, Nelson discusses ground fifteen as ground sixteen. (See Doc. 2, pp. 81-86.)

*Arizona,* 536 U.S 584 (2002), does not warrant federal habeas relief.  The United States Supreme Court's extension of the *Apprendi* rationale to capital cases in *Ring v. Arizona*, 536 U.S. 584 (2002), has not affected Florida's capital sentencing scheme because Florida's capital sentencing procedures do not create the Sixth Amendment error identified in *Ring.* The Florida Supreme Court has repeatedly held that, unlike Arizona, in Florida a defendant is eligible for the death penalty upon conviction for first degree murder. *See Mills v. Moore*, 786 So. 2d 532, 536-38 (Fla. 2001) (statutory maximum for first degree murder is death); *Shere v. Moore*, 830 So. 2d 56, 61 (Fla. 2002) ("This Court has defined a capital felony to be one where the maximum possible punishment is death."). Because *Ring* holds that any fact which increases the penalty beyond the statutory maximum must be found by the jury, and because death is the statutory maximum for first degree murder in Florida, *Ring* does not establish any Sixth Amendment error under Florida's statutory scheme.[30] Thus, Nelson is unable to establish any entitlement to federal habeas relief based on the state court's ruling rejecting his constitutional challenge to Florida's death penalty statute. Pursuant to the AEDPA, it is Nelson's responsibility to demonstrate that the state court's determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  Nelson has failed to carry his burden under the AEDPA.

Ground fifteen does not warrant habeas corpus relief.

Accordingly, the Court orders:

---

[30] The Florida Supreme Court addressed the instant issue on the merits when Nelson first raised it in his motion for rehearing after his direct appeal. *See Nelson v. State*, 850 So. 2d 514, 533 (Fla. 2003) (rejecting argument that Florida's capital sentencing scheme violated *Apprendi* and *Ring* based on prior precedent).

That Nelson's petition is denied.  The Clerk is directed to enter judgment against Nelson and to close this case.

## CERTIFICATE OF APPEALABILITY AND

## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts because Petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

Because Petitioner is not entitled to a certificate of appealability, Petitioner is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on March 13, 2012.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Counsel of Record